PUBLISH

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
09/29/99
THOMAS  K. KAHN
CLERK

No. 97-5380

D.C. Docket No. 92-325-CIV-CCA

ALAN B. LEVAN, an individual plaintiff, BANKATLANTIC
FINANCIAL CORPORATION, a Florida corporation,

Plaintiffs-Appellees-Cross-Appellants,

versus

CAPITAL CITIES/ABC, INC., a New York corporation,
WILLIAM H. WILLSON, an individual,

Defendants-Appellants-Cross-Appellees.

Appeals from the United States District Court
for the Southern District of Florida

**(September 29, 1999)**

Before TJOFLAT, BLACK and CARNES, Circuit Judges.

TJOFLAT, Circuit Judge:

Appellees BFC Financial Corporation ("BFC"),[1] and its President, Chief Executive Officer, and controlling shareholder, Alan Levan, brought this action for defamation against Capital Cities/ABC, Inc. ("ABC") and one of its producers, Bill Willson. Their cause of action arose from a segment aired on ABC's television program "20/20" that portrayed BFC and Levan as unfairly taking advantage of investors in real estate related limited partnerships, by inducing them to participate in transactions known as "rollups." Appellees claimed that in its broadcast ABC made numerous false or misleading statements with actual malice, and that ABC and Willson therefore were liable for injuries that appellees suffered as a result of the story. After the jury returned a verdict in favor of appellees, awarding them significant compensatory damages, ABC and Willson renewed their motion for judgment as a matter of law made at the close of evidence.[2] The district court denied their motion and entered judgment pursuant to the jury's verdict.

ABC and Willson appeal the district court's denial of their motion for judgment as a matter of law; appellees cross-appeal the district court's refusal to instruct the jury on their claim for punitive damages. We conclude that ABC and Willson are entitled

---

[1] BFC's name has changed several times since its inception. We refer to BFC and its predecessors simply as "BFC."

[2] ABC and Willson also moved the court to grant them a new trial or alternatively a remittur. Because we conclude that the district court should have granted ABC and Willson judgment as a matter of law, we neither reach nor discuss the merits of their motion for a new trial or remittur.

to judgment as a matter of law.  The evidence, taken as a whole, was insufficient to establish one of the elements of appellees' claim: that ABC and Willson broadcast the story with actual malice.  We therefore vacate the district court's judgment in favor of appellees and instruct the district court to enter judgment for appellants.  Given this disposition of the main appeal, we need not consider appellees' cross-appeal.

I.

During the early 1980s, Alan Levan and his company, BFC, were engaged in the business of organizing and managing commercial real estate limited partnerships.  The idea behind these partnerships was that small investors, who individually could not raise the millions of dollars needed to invest in commercial real estate, could invest small amounts of money in these limited partnerships (averaging between $5,000 to $20,000 dollars per investor) which would then pool the investors' money and purchase commercial properties.  It was anticipated that the partnerships would hold onto the properties for a period of time ranging from between four to nine years and then sell the properties and distribute the proceeds among the investors.  In each limited partnership, a wholly-owned subsidiary of BFC served as the managing general partner, and Alan Levan, as well as several

3

other individuals associated with BFC, served as individual general partners.

In the mid-1980s, however, there was a severe nationwide decline in the value of real estate. The properties held by Levan's limited partnerships were no exception, and consequently, the value of the limited partners' interests plummeted. In response to this downturn in the real estate market, Levan and BFC offered their limited partners the two exchanges that are at the center of this dispute. The two transactions, which were completed in 1989 and 1991, respectively, were of a type referred to in the industry as a "rollup." In essence, each transaction was an exchange: the limited partners gave BFC their partnership interests (that is, their real estate interests and any other assets held by the partnership), and in return the limited partners received debentures issued by BFC.[3] The two rollups were nearly identical in form; we therefore discuss only the 1989 transaction in detail.

The 1989 exchange involved three limited partnerships (the "1989 Partnerships"). At the time of the exchange, these partnerships held properties

---

[3] These exchanges, although widely characterized by industry experts as rollups, were different from the typical rollup transaction. In the typical rollup, the limited partners of several partnerships are offered the opportunity to merge their partnerships together, thereby creating a new entity – either a new limited partnership or a corporation – which assumes the rights and responsibilities of the original partnerships. If the limited partners approve the rollup, then they give up their original partnership interests in return for interests in the new partnership or shares in the new corporation. In the rollups offered by BFC, in contrast, the limited partners were given the opportunity to trade their partnership interests for debentures in the managing general partner, BFC.

4

with an aggregate appraised value of $44 million.[4] The partnerships also held

approximately $2 million in cash. Thus, BFC acquired a total of $46 million in

assets from the 1989 Partnerships in the exchange.[5] In return, BFC gave the

limited partners debentures that had a face value of $30 million. These debentures

were unsecured and subordinated, which meant that if BFC went bankrupt, the

debenture holders would be the last creditors in line to be paid from BFC's assets.

The debentures were to mature in 20 years (July 1, 2009). Until maturity, the

debentures were to bear interest (paid quarterly) at 8% for the first year, 9% for the

second year, and 10% thereafter. If BFC's management determined that payment

of interest during any quarter would "impair the operations of [BFC]," then BFC

had the right to defer interest payments for that quarter. Deferred interest was due

on maturity of the debentures; such interest would accrue interest at the current

interest rate of the debentures until it was paid. Further, if BFC deferred interest

for a total of eight quarters, then the interest on the debentures increased to 12%

until maturity. After a one-month consent period, the limited partners approved the

---

[4] The actual appraised value of the properties was $77.6 million. The properties, however, were encumbered by a total of $33.6 million in debt. Thus, the $44 million figure represents the net appraised value of the real estate.

[5] The limited partners originally invested a combined total of $61 million in the 1989 Partnerships. As of September 30, 1988, the limited partners had received $18.4 million in distributions as a return on their original investment. The limited partners also gained substantial tax benefits as a result of their partnership interests.

transaction by a two to one ratio.[6]

ABC began looking into the BFC rollups in the summer of 1990. Many other limited partnerships across the nation were engaging in rollup transactions at that time, and a large number of these transactions were criticized by experts (in real estate and financial matters) as being unfair to the limited partners. After ABC received a letter from one angry investor (who had participated in a rollup unrelated to the two that BFC consummated) complaining about these exchanges, it decided to investigate and air a story about rollups on its "20/20" news program. John Stossel, a 20/20 on-air-correspondent, and appellant Bill Willson, a producer, were assigned to work on the story. As its investigation unfolded, ABC decided to focus its story on the BFC rollups.

In the course of its investigation, ABC turned to a wide variety of sources, including congressional staff members, limited partnership experts, and securities

---

[6] Although the 1991 exchange was structured almost identically to the 1989 exchange, the terms that BFC offered in the 1991 exchange were even more unfavorable to the limited partners. BFC offered the 1991 exchange to four limited partnerships, which had a combined original capital investment of $112 million. At the time of the exchange, the partnerships held properties with a total appraised value of $77 million. These properties were encumbered by mortgages totaling $46 million. The partnerships also had other net liabilities of approximately $500,000. In the exchange proposed by BFC, the limited partners were to give up these assets in return for a total of $17 million in unsecured subordinated debentures. These numbers reflect the total for all four partnerships; however, only three of the four approved the transaction. The three approving partnerships received 20-year debentures which mature on July 1, 2011. Until maturity, the debentures bear interest at 10.5% for the first year, 11.5% for the second year, and 12.5% thereafter. If BFC deferred interest payments for eight quarters, then the interest rate would increase to 13% until maturity.

analysts. ABC attended a hearing before the Securities and Exchange Commission, as well as numerous congressional hearings, including one hearing specifically dedicated to investigating the BFC rollups.[7] These sources almost uniformly criticized the rollups as being grossly unfair to the limited partners.[8]

First, ABC's expert sources criticized the value of the debentures that the limited partners received. Although BFC acquired $46 million in properties and cash from the 1989 Partnerships, it exchanged those assets for only $30 million in debentures.[9] The experts condemned this reduction in the value of the limited

---

[7] Levan appeared at this hearing and testified in defense of the 1989 and 1991 transactions.

[8] Many of these experts were of the opinion that limited partners probably voted for the transactions because they did not read, or could not understand, the three-hundred-plus page prospectuses that disclosed the terms of the exchanges.

[9] BFC explained in its prospectus that this difference accounted for the following:
[T]he uncertainties of the appraisal process . . . [,] because there is no assurance that the assets of the [partnerships] could ultimately be sold for [$46 million] . . . [, because] the appraised values do not take into account the costs to be incurred upon sale of the properties . . . [and because the appraised values are not] discounted in light of the fact that the sale of real properties to third parties typically involves a sale on terms pursuant to which a portion of the purchase price is paid to the seller in installments or otherwise over a period of time.
BFC did include in the terms of the deal a method of compensating the limited partners in case it sold the properties that it gained in the exchange for more than $30 million. If BFC netted more than that amount (adjusted based on a complex formula that took various factors into account such as the cost of the real estate sales) from the sale of the properties, then BFC was required to pay the investors as "additional consideration" 100% of the amount over $30 million. BFC could pay this consideration in either cash or additional debentures. Although this feature of the transaction might appear to be favorable to the limited partners, ABC's objective expert sources thought it was extremely unlikely that BFC would be required to pay any additional consideration. BFC was desperately in need of cash when the rollup was consummated; thus, BFC anticipated that it would sell the properties as quickly as possible. Because BFC needed to sell the properties quickly, it most likely would be forced to sell the real estate at prices substantially below their appraised value. In

partners' interest (which amounted to 34.7% of the net value of the partnerships'

assets) as unjustified.  Further, these experts pointed out, not only was the face

value of the debentures too low, but the actual market value of the debentures was

even lower.  The market value of a debenture depends primarily on the market's

perception of the financial stability of the issuing company – that is, the bonds are

not highly valued if there is a significant risk that the issuer will not be able to pay

the interest or the principal.  In BFC's case, the market perceived BFC's

debentures as a poor investment.  During 1988 and 1989, BFC suffered losses of

$4.4 million and $6.9 million, respectively.  These losses were due to the weak

financial condition of its primary asset, a savings and loan called BankAtlantic.[10]

Between 1988 and 1990, BankAtlantic sustained aggregate losses of $17.8 million.

As a result of BFC's and BankAtlantic's financial woes, there was almost no

market for the debentures.[11]  When buyers could be found, the debentures traded

for as low as 21% of their face value.  Thus, the limited partners, who gave up $46

million in assets, ended up with debentures that had a market value of only about

---

fact, these experts turned out to be correct; BFC sold ten of the fourteen properties within two years of the exchange but paid no "additional consideration" to the limited partners.

[10] In 1989, BFC owned 53.4% of BankAtlantic, and the bank represented 98% of BFC's assets.  BFC's interest in BankAtlantic grew to 70.1% by the time of ABC's broadcast in 1991.

[11] The debentures were not quoted on NASDAQ or listed on any exchange; to the extent that they were traded, they were sold on so-called "yellow sheets," which are wholesale quote sheets used by dealers.

$6 million.

In light of the high risk that BFC would be unable to pay either the interest or the principle on the debentures, experts uniformly agreed that the debentures were "junk bonds" – in fact many experts characterized the debentures as worse than junk bonds. Junks bonds are bonds that have a high risk of nonpayment and therefore yield a high interest rate. Many experts opined to ABC that in light of BFC's shaky financial condition, the debentures should have carried a much higher rate of interest. The interest rate for the debentures issued in the 1989 transaction was 8% for the first year, 9% for the second year, and 10% thereafter. This rate was lower than the Prime Rate (the rate that banks charge to their most creditworthy customers), which was 11% on the day that BFC issued its prospectus for the 1989 transaction.[12]

When compared to what the limited partners received, namely, debentures that the market valued at about $6 million, ABC's expert sources pointed out, BFC fared quite well in the 1989 exchange. Of the fourteen properties that BFC gained in the exchange, by 1991 BFC had sold ten of the properties for a net gain of $16 million. Thus, adding in the approximately $2 million in cash that BFC acquired

---

[12] We take judicial notice of the Prime Rate on February 14, 1989, the date on which BFC issued its prospectus. This figure was provided by the Federal Reserve Board, and cannot reasonably be disputed. See The Fed. Reserve Bd., Federal Reserve Statistical Release (visited Sept. 8, 1999) <http://www.bog.frb.fed.us/releases/H15/data/d/prime.txt>.

from the partnerships, BFC gained $18 million in cash as well as the four remaining unsold properties.

The low value of the debentures was hardly the only criticism that the experts leveled at the transactions. A second criticism was that there were serious negative tax implications for the limited partners arising from the exchanges. For instance, some limited partners may have realized a taxable gain from the exchanges even though they received no cash distribution with which to pay the taxes. Further, although BFC had the right to defer interest payments on the debentures (and in fact did defer all interest payments after December 1991), the limited partners had to pay taxes each year on the deferred interest, as if it constituted ordinary income, even though they received no money to pay the taxes.[13]

A third criticism that the experts directed towards the exchanges was that an investor who voted against the transaction had no right (under the terms of the limited partnership agreements) to opt-out and receive the appraised value of his

---

[13] The serious consequences of BFC's right to defer interest payments is demonstrated by what actually happened. As stated above, BFC deferred all interest payments on the debentures after December 1991. If BFC decided to continue deferring the payments until the bonds matured in 2009, the limited partners who participated in the 1989 exchange would be required to report as ordinary income (for federal income tax purposes) the deferred interest every year between 1992 and 2009. Thus, in 1992, for example, the limited partners were treating as ordinary income money they might not receive for eighteen years.

interest.[14] Thus, investors, who bought into one of the 1989 Partnerships and anticipated that their investment would be returned in four to nine years, had no choice but to accept bonds that would not mature until 2009.[15]

Fourth, ABC's expert sources widely criticized the exchanges because of Levan's significant conflicts of interest. Levan was a general partner of each of the limited partnerships, President and controlling shareholder of BFC, and Chairman of BankAtlantic. Given that BFC was able to sell, within two years of the exchange, ten of the properties that it acquired from the 1989 Partnerships for $16 million, many experts questioned why Levan recommended the exchange to the limited partners rather than foregoing the exchange and selling the properties on behalf of the partnerships. That way, the limited partners would have ended up with $18 million in cash ($16 million from the sale of the properties and two $2 million in cash), plus four properties, rather than debentures valued on the market at about $6 million.

A number of experts concluded that Levan devised the exchanges in order to

---

[14] Congress later enacted legislation that prohibited rollup transactions that did not provide appraisal rights to dissenting investors. See Limited Partnership Rollup Reform Act of 1993, Pub. L. No. 103-202, § 303(a)(12)(A), 107 Stat. 2344, 2364 (1993).

[15] The lengthy period of time before the debentures matured would be particularly troubling to elderly investors who undoubtedly did not want to wait twenty years to get their money back.

infuse capital into BankAtlantic, BFC's cash-starved savings and loan. BankAtlantic sustained substantial net losses each year from 1988 to 1990, and by the end of 1990, it was unable to meet its capital requirements. Many experts told ABC that Levan's strategy to keep the bank afloat was to consummate the exchanges, quickly sell the acquired real estate for cash, and infuse the proceeds into the bank. As evidence, these experts pointed to the fact that between 1989 and 1991 BFC infused a total of $9.4 million. Although BFC's investment enabled the bank to comply with its capital requirements by early 1991, the Director of the Office of Thrift Supervision, Department of the Treasury, testified before Congress that without the money that BFC put into the bank, it would not have met the capital requirements.[16] In the words of a congressional staff member who testified at the same hearing, "The rollups . . . apparently are intended to provide the means by which the bank and holding company will survive. In the conflict between Mr. Levan's fiduciary responsibilities . . . , the needs of the bank appear to have prevailed over his responsibility to the partnerships." See The Rollup of Real

---

[16] The Director of the Office of Thrift Supervision was not alone in this opinion. Thomas Montgomery, minority counsel of the Committee on Energy and Commerce testified before Congress that the bank was dependent on BFC to meet its capital requirements, and that "[w]ithout the rollups, [BFC] would not have had the capital it needed to finance the bank." See The Rollup of Real Estate Limited Partnerships, by the BankAtlantic Financial Corp.: Hearing Before the Subcomm. on Oversight and Investigations of the House Comm. on Energy and Commerce, 102d Cong. 7 (1991).

Estate Limited Partnerships, by the BankAtlantic Financial Corp.: Hearing Before the Subcomm. on Oversight and Investigations of the House Comm. on Energy and Commerce, 102d Cong. 8 (1991) (statement of Thomas C. Montgomery, minority counsel).

A fifth criticism that experts made was directed only towards the 1991 exchange. In that exchange, BFC discounted by 10% the appraised value of the real estate held by the partnerships. BFC explained (in its prospectus to the limited partners) that this discount was necessary in order to account for the costs and expenses it would incur in selling the properties. ABC's expert sources viewed this discount as unfair because the costs that BFC incurred in selling the real estate it acquired in the 1989 transaction averaged only 2.5% of the appraised value of the property – nowhere near 10%.

Although the wide array of objective experts whom ABC contacted (or otherwise heard from through publications, Congressional testimony, or testimony before the SEC) uniformly condemned the rollups as unfair, these experts were not the only sources ABC used in composing its broadcast. ABC was present when Levan testified before Congress regarding the rollups and obtained a transcript of his testimony. It also had substantial interaction with BFC, and, specifically, with Levan himself. He provided information, documents, and videotapes, about the

13

rollups.

The parties interaction included a five to six hour off-camera discussion between Willson and Levan.[17] ABC negotiated with Levan for months in order to obtain an on-camera interview with him that it could use in the broadcast. Such an interview never took place, however, because Levan and ABC could not agree on the ground rules for the interview; as a substitute, Levan sent ABC a videotape which he prepared and on which he answered specific questions about the rollups. ABC aired parts of this tape during its broadcast.

ABC broadcast its report on the BFC rollups, which it titled "Too Good to Be True," on November 29, 1991.[18] Although the broadcast expressly stated that the rollups were legal, it was very critical of the fairness of the transactions to the limited partners.[19]

## II.

In February 1992, Levan and BFC filed this lawsuit against Willson and

---

[17] The parties disagree as to whether this discussion was on or off the record.

[18] ABC's 20/20 program is a one hour television show that airs weekly. ABC's story about the BFC rollups was one of three stories that aired on 20/20 that evening.

[19] The broadcast revealed the terms of the transactions, and focused specifically on the low market value of the debentures. It also included, inter alia, interviews with limited partners who voted against the exchanges, and videotape excerpts of the congressional hearings on the BFC rollups.

14

ABC in the United States District of Southern District of Florida, alleging false light invasion of privacy[20] and defamation.[21] Levan and BFC alleged that ABC made a number of false statements or implications in the broadcast. The most damaging of these were that (1) ABC falsely implied that Levan had refused any contact with ABC, and, therefore, that he had something to hide; (2) in broadcasting parts of the videotape Levan had sent ABC, ABC altered some of the lead-in questions and took some of Levan's statements out of context, thus creating false impressions about the rollup; and (3) ABC portrayed statements made by a member of Congress at a congressional hearing in such a way as to create false impressions about events at that hearing. The underlying allegation was that ABC had manipulated interviews and other footage to create the false impression that

---

[20] At trial, at the close the evidence, the district court dismissed the false light claim against both Willson and ABC. The court held that the false light and defamation claims were duplicative and thus not separately actionable under Florida law. The appellees have not challenged this ruling in their cross-appeal.

[21] Discovery ensued, but trial was delayed while ABC and Willson attempted to intervene as interested parties in a class action lawsuit of limited partners against Levan and BFC. This suit, Purcell v. BankAtlantic Fin. Corp., 89-1284-CIV (S.D. Fla.), was a consolidation of three separate class action lawsuits brought by the limited partners who voted against the 1989 transaction. The plaintiffs alleged that Levan and BFC had violated federal securities laws and sought damages and rescission of the debentures. A jury found for the plaintiffs and awarded $8 million in damages. Before the case could be appealed, the parties reached a settlement whereby BFC and Levan agreed to pay the amount awarded by the jury and in exchange the parties agreed to vacate the judgment. In order to preserve the collateral estoppel effect on the present case, ABC filed a motion to intervene in Purcell, in effect to prevent the vacatur. That motion was denied, and this Court affirmed. See Purcell v. BankAtlantic Fin. Corp., 85 F.3d 1508 (11th Cir. 1996).

15

Levan had deliberately set out to defraud his investors.[22]

The case went to trial in late 1996. The trial lasted seven weeks. The jury found against ABC and Willson and awarded $1.25 million to BFC and $8.75 million to Levan in compensatory damages.[23] The district court denied appellants' post-verdict renewed motion for judgment as a matter of law, or in the alternative for a new trial or remittur of damages. On appeal, ABC and Willson contend that the trial court erred in not granting their motion for judgment as a matter of law because, <u>inter alia</u>, Levan and BFC did not produce clear and convincing evidence

---

[22] On January 10, 1992, ABC broadcast three corrections to the report, which were read on the air by 20/20 anchorman Hugh Downs. First, ABC admitted that it had overstated the value of one of the real estate properties exchanged in the roll-up because ABC had not taken into account a substantial mortgage on the property. Second, ABC clarified its statement in the report that Levan "wouldn't talk to us." ABC admitted that, although the two sides could not agree on the ground rules for an on-camera interview, Levan had communicated with ABC in various ways, including sending it a videotape where Levan answered questions he thought ABC would ask. Finally, ABC admitted that its use of portions of this videotape may have mislead viewers: "Portions of that tape were aired, although our editing of that material may have lead some viewers to believe that money and property were transferred directly from a group of investors to Mr. Levan personally. Well, any such impression was inadvertent and erroneous and we're sorry if there was any misunderstanding of this kind." While these corrections may be relevant to the issue of damages, the fact that ABC made them does not constitute clear and convincing evidence ABC acted with actual malice at the time it broadcast its report.

[23] In their complaint, Levan and BFC also sought punitive damages. At the close of appellants' case, the district court dismissed the claim for punitive damages on the ground that the appellants had produced insufficient evidence for a jury reasonably to conclude that ABC and Willson had acted with the primary purpose of "ill will, hostility, and attempt to defame" as required under Florida law. Levan and BFC have challenged the court's ruling in their cross-appeal, arguing that the court erred in dismissing their claim for punitive damages. Because we direct that judgment be entered for appellants, we do not reach the cross-appeal.

16

of actual malice.[24]  We agree.

### III.

Because this case involves a public figure plaintiff,[25] and the broadcast was a matter of public concern, Levan and BFC are required to prove not only that the statements alleged were defamatory and false, Philadelphia Newspapers, Inc. v. Hepps, 475 U.S. 767, 775-77, 106 S. Ct. 1558, 1563-64, 89 L. Ed. 2d 783 (1986), but also that ABC acted with "actual malice," New York Times Co. v. Sullivan, 376 U.S. 254 279-80, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686 (1964).  A showing of actual malice may be made by showing that the defendant published the defamatory statement either "with knowledge that it was false or with reckless disregard of whether it was false or not." Id. at 280, 84 S. Ct. at 726.  Actual malice

---

[24] ABC and Wilson contend that the district court committed other errors during the prosecution of the case.  They contend that the district court erred in not admitting evidence of the jury verdict in Purcell v. BankAtlantic Fin. Corp., 89-1284-CIV (S.D. Fla.), see supra n.21, and surrounding publicity to mitigate any injury to reputation suffered by Levan and BFC.  They also contend that the trial court erred in applying the appropriate burden of proof to the element of falsity and in refusing to hold that the broadcast as a whole was protected opinion.  Finally, they contend that the jury's damages award was excessive and cannot be sustained as a matter of law.  Because we find that judgment must be entered for ABC and Willson on the issue of actual malice, we do not reach these claims of error.

[25] The district court held prior to trial that Levan and BFC were public figures and thus (in addition to establishing by a preponderance of the evidence that the 20/20 story was false) had to prove by clear and convincing evidence that ABC and Willson acted with actual malice to recover.  See New York Times v. Sullivan, 376 U.S. 254, 279-80, 84 S. Ct. 710, 726, 11 L. Ed. 2d 686 (1964).  Levan and BFC do not challenge the public figure finding on appeal.

17

requires more than a departure from reasonable standards of journalism; "[t]here must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication." St. Amant v. Thompson, 390 U.S. 727, 731,  88 S. Ct. 1323, 1325, 20 L. Ed. 2d 262 (1968).  A public figure is required to prove actual malice by clear and convincing evidence. See Morgan v. Tice, 862 F.2d 1495, 1500 (11th Cir. 1989) (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 342, 94 S. Ct. 2997, 3008, 41 L. Ed. 2d 789 (1974)).[26]

Our standard of review in libel cases in which the actual malice standard forms part of the jury charge is higher than in other cases.  We are required to make an "independent examination of the entire record," New York Times, 376 U.S. at 285, 84 S. Ct. at 729, to determine whether the evidence offered at trial supports a finding of actual malice.  There is, however, some confusion on how this review relates to factual findings made by the jury.  The Supreme Court reiterated in Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657,

---

[26] Neither the Supreme Court nor this Court have expressly decided whether the plaintiff must prove falsity by clear and convincing evidence or simply a preponderance.  See Harte-Hanks Communications, Inc. v. Connaughton, 491 U.S. 657, 661 n.2, 109 S. Ct. 2678, 2682 n.2, 105 L. Ed. 2d 562 (1989).  But cf. Morgan, 862 F.2d at 1500 (stating in dicta that both falsity and actual malice require clear and convincing proof).  The Ninth Circuit, among others, has concluded that preponderance is sufficient.  See Rattray v. City of Nat'l City, 51 F.3d 793, 801 (9th Cir. 1994).  Florida's model jury instructions for libel also require simple preponderance.  See In re Standard Jury Instructions, 575 So. 2d 194, 200 (Fla. 1991).  Because we find that there was not clear and convincing proof of actual malice at trial, we decline to address this issue.

18

109 S. Ct. 2678, 105 L. Ed. 2d 562 (1989), that credibility determinations are reviewed under a clearly erroneous standard because of the jury's "'opportunity to observe the demeanor of the witnesses,'" id. at 688, 109 S. Ct. at 2696, (quoting Bose v. Consumers Union, Inc., 466 U.S. 485, 499-500, 104 S. Ct. 1949, 1958-59, 80 L. Ed. 2d 502 (1984)). Most courts show less deference when factfinding "rel[ies] on weighing of evidence and drawing of inferences." Newton v. National Broad. Co., 930 F.2d 662, 671 (9th Cir. 1990); see also Christ's Bride Ministries, Inc. v. Southeastern Pa. Transp. Auth., 148 F.3d 242, 247 (3d Cir. 1998), cert. denied, 119 S. Ct. 797 (1999). But see Peter Scalamandre & Sons, Inc. v. Kaufman, 113 F.3d 556, 560 (5th Cir. 1997) (holding no special review is accorded to "preliminary factual issues"). In any event, a de novo review of the entire record is not required; we must only satisfy ourselves that the evidence is sufficient for a finding of actual malice.[27] See Braun v. Soldier of Fortune Magazine, Inc., 968 F.2d 1110, 1120-21 (11th Cir. 1992) (holding that the purpose of First Amendment independent review is "to guarantee that the jury imposed no greater burden [on the defendant] than the Constitution permits").

Under Florida law, a statement is not defamatory unless the "gist" or "sting"

---

[27] We recognize, therefore, that the law is unsettled as to the deference that we give to "facts" found by the jury. In this case, however, most of the crucial evidence that relates to the actual malice element is undisputed: specifically, the overwhelming evidence that ABC had to support the broadcast's conclusion that the rollup was unfair to the limited partners.

19

of the statement is defamatory. See Smith v. Cuban Am. Nat'l Found., 731 So. 2d 702, 706 (Fla. 3d DCA 1999). The gist of any statement within a publication or broadcast is found only by reference to the entire context. See Byrd v. Hustler Magazine Inc., 433 So. 2d 593, 595 (Fla. 4th DCA 1983). If the gist is substantially true, then minor inaccuracies are insufficient to prove actual malice. See Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 517, 111 S. Ct. 2419, 2433, 115 L. Ed. 2d 447 (1991). Our first job, therefore, is to determine the gist[28] or sting of the report.[29]

The parties have vehemently disagreed about the gist of the ABC report. Appellants argue that the gist was merely that the rollups were unfair, which the broadcast demonstrated by juxtaposing the undervalued debentures that the limited partners received with Levan's financial success after the transactions were

---

[28] In using the term "gist," we do not mean to confuse the issue at hand. Cf. Bressler v. Fortune Magazine, 971 F.3d 1226, 1237 (6th Cir. 1992) (Batchelder, J., dissenting). "Gist" is a term typically associated with the common law defense of substantial truth, the burden of which lies with the defendant. In a public figure libel action, the burden of proving that a statement is false lies with the plaintiff. The parties in this case agree that we must determine what the report, taken as whole, is actually alleging about Levan, and then determine if ABC broadcast that meaning with actual malice. We use "gist" as shorthand for this concept, although it might be more accurate, if somewhat clumsy, to ask what is the "'effect on the mind of the reader.'" Masson, 510 U.S. at 517, 111 S. Ct. at 2433 (quoting R. Sack, Libel, Slander, and Related Problems 138 (1980)).

[29] We recognize that the "gist" or "sting" of an alleged defamatory statement is a factual question. In this case, however, the gist of the report is intertwined with Levan's allegations of actual malice, which we must subject to independent review. See Braun, 968 F.2d at 1120-21. Unlike other factual findings, ascertaining the gist does not depend on resolving credibility issues, which are better left to the factfinder. See Connaughton, 491 U.S. at 688, 109 S. Ct. at 2696.

20

completed. Appellees, on the other hand, maintain that the gist of the broadcast was that Levan <u>knowingly</u> misled the limited partners into accepting the rollup transaction, thereby benefitting himself, BFC, and BankAtlantic.[30] This implication, appellees argue, follows from ABC's "hiding" theme: because the broadcast presented Levan as refusing to speak with ABC on camera, ABC implied that he had something to hide.

We conclude that the answer is somewhere in between: ABC clearly implied that the limited partners got a raw deal, one so bad that a viewer would believe Levan <u>must</u> have known that the deal was unfair to his limited partners, particularly in light of his financial expertise.[31] ABC does not expressly say so, but this implication is apparent when viewing the report as a whole. ABC made numerous references to the devaluation of the debentures the investors received, including that they had lost around 80% of their face value. One of Levan's former

_____

[30] This gist is important to appellees' argument because much of their proffered evidence of actual malice consists of various statements by ABC employees that they believed that Levan thought the transaction <u>was</u> fair. If the gist of the broadcast was, as appellees contend, that Levan knowingly misled his investors, then these statements tend to demonstrate that appellants entertained serious doubts that the gist of their story was true.

[31] Appellees point to a number of statements or images contained in the broadcast that, according to them, are false or misleading. Whether or not these statements or images convey a false message to the viewer, however, does not alter the gist of the story, which was that the deals were grossly unfair – so much so that Levan must have known they were unfair. <u>See</u> <u>Masson</u>, 501 U.S. at 517, 111 S. Ct. at 2433 (stating that minor inaccuracies do not affect the substantial truth of a publication).

business partners stated on camera that the transaction was done "only for the benefit" of Levan. The report acknowledged that Levan's prospectus disclosed both the particulars of the transaction and Levan's conflicts of interest, but it also depicted limited partners and a member of Congress stating that the prospectus was too long and complicated for an average investor to understand.[32]

Having ascertained the gist of the story, it is next incumbent upon us to determine, by making an independent review of the record, whether appellees established actual malice by clear and convincing evidence. We conclude that the proof was insufficient to show that ABC "entertained serious doubts" that the underlying thrust of the broadcast was true. As we have said, most of the evidence that related to actual malice was undisputed: the numerous experts ABC consulted, the views of the limited partners ABC interviewed, the testimony given at the Congressional hearing on Levan's rollup, but most importantly, the terms of the transaction itself.

In concluding that appellees failed to establish a case of actual malice, we have not overlooked the pieces of evidence that, appellees contend, demonstrated a

_____

[32] On the other hand, Levan was not left out to dry; the broadcast acknowledged that the transaction was legal, and that the devaluation of the limited partnerships' real estate holdings was caused by a volatile market and changing tax laws, not Levan. Further, ABC showed Levan defending himself. ABC aired a tape of Levan answering this exact question: a voice-over asked if the deal was "fair," and Levan answered, "A majority of the partners voted to accept more risk for the possibility of greater return. I think they made the right decision."

22

reckless disregard by ABC for the truth of the broadcast. Most of this evidence consists of (1) statements made by Willson (to Levan or his attorney) in an attempt to secure an on-camera interview with Levan,[33] and (2) ABC's use of the videotape Levan provided in which he answered questions that Willson had informed him would be covered if Levan consented to a on-camera interview.[34] Taken as a whole this evidence pales in contrast to the numerous sources who told ABC that Levan had given the limited partners practically worthless junk bonds in return for valuable partnership assets, in violation of his fiduciary duty as general partner.

Before ABC broadcast its report, Willson and others spoke with numerous objective experts who uniformly condemned the 1989 transaction as unfair,

---

[33] For example, Willson made a number of statements to Levan such as "I don't care about the truth," or "the truth is irrelevant to me." In response, Willson explained (before the jury) that he merely meant that it was not his job to broadcast the truth, but to provide both sides of a story and let the viewer decide which to accept.

[34] ABC eventually used the videotape in the broadcast, with a disclaimer that it had been provided by Levan. The videotape was made by a professional media consultant, using a list of questions Willson had provided Levan's attorney. Appellees' main evidence of actual malice was that, in the broadcast, ABC altered one of the questions; the question presented in the broadcast was slightly different from the one Levan answered. The question ABC posed to Levan asked whether he had conflicts of interest in the transaction. In the broadcast, ABC changed the question to, "[i]sn't keeping the real estate for [your]self a conflict of interest?" Although the question that ABC aired was different (and may have incorrectly implied that Levan, not BFC, owned the real estate after the rollup), it was only slightly so – the question, and the answer, was at heart about whether it was fair for Levan to be on both sides of the transaction. See St. Surin v. Virgin Islands Daily News Inc., 21 F.3d 1309, 1316 (3d Cir. 1994) ("Minor inaccuracies regarding factual information will not make an article untrue and libelous so long as the statement would not materially mislead the reader."); Smith v. Cuban Am. Nat'l Found., 731 So.2d 702, 706 (Fla. 3d DCA 1999). The answer aired is the one Levan has always given – that there were conflicts of interest but that they were adequately disclosed in the prospectus given to the limited partners.

23

particularly in light of the low market value of the debentures. Spencer Jeffries, an expert on limited partnerships who testified at trial, wrote a lengthy report concluding that the debentures BFC issued were worth much less than their face value, and that the entire transaction was done to save the cash-poor BankAtlantic. During its investigation, ABC interviewed a limited partnership expert on-camera. In the interview, which was admitted at trial, the expert said that had he been one of appellee's limited partners, he would not have voted for the transaction. Willson testified that after the story was written but prior to the broadcast, ABC double-checked with numerous securities analysts to confirm the report's conclusion that the bonds were essentially "junk." All agreed that the bonds were junk; moreover, they said they would advise their clients not to buy the bonds. Stossel testified that he spoke with three other industry professionals to confirm that the bonds were worth much less than face value.

ABC also attended congressional hearings investigating rollup transactions, including one hearing that specifically investigated the BFC rollups.[35] See The Rollup of Real Estate Limited Partnerships, by the BankAtlantic Financial Corp.: Hearing Before the Subcomm. on Oversight and Investigations of the House

---

[35] Levan testified at the hearing and defended the rollups. ABC was unable to include his testimony in its broadcast because Levan invoked a congressional rule that permits a witness to insist that his testimony not be recorded by the media.

Comm. on Energy and Commerce, 102d Cong. (1991). At least three Congressmen offered unfavorable opinions of the rollup. Two congressional staff members testified that the bonds had declined significantly in value and that the interests of the limited partners had been subordinated to the needs of BFC and BankAtlantic. Thomas Ryan, the Director of the Office of Thrift Supervision, testified that BankAtlantic was a "troubled" institution, id. at 32, and James Doty, General Counsel of the Securities and Exchange Commission, testified that the bonds, being unsecured and speculative, were currently worth as low as 14.3% of the appraised value of the properties that BFC acquired in the 1989 exchange, id. at 66.

Finally, ABC had before it the terms of the 1989 and 1991 transactions, which a person even mildly familiar with investments would conclude was unfair to the limited partners.[36] In the 1989 transaction, the partnerships exchanged real estate appraised at $44 million and $2 million in cash for unsecured subordinated bonds with a face value of $30 million, not due for 20 years. Moreover, the terms of the deal allowed BFC to defer interest payments until the bonds matured. Given BFC's financial difficulties, the interest rate the debentures provided was far below

---

[36] On cross-examination at trial, both Levan and his expert, Steven Goldstein, admitted that a reasonable investor might conclude that the roll-ups were unfair, even though that was not their personal view. Levan's counsel repeated this admission in his closing argument to the jury.

the rate necessary to enable the bonds to trade near face value.  The specified interest rate was so low that, by the time of ABC's broadcast, the market for the debentures had collapsed.  The 1991 transaction was nearly identical in structure to the 1989 transaction but provided for an even greater "discount" in the exchange rate between the partnerships' assets and the debentures.  Of course, permeating both transactions were Levan's substantial conflicts of interest: he was on both sides of the fence as a general partner on one side and a part-owner and officer of BFC and BankAtlantic on the other.

While ABC was investigating the rollups, Levan recommended that it interview Steven Goldstein, an expert in limited partnerships.  Goldstein, who testified at trial, believed that the BFC rollups were fair, given the troubled real estate market and the consequent declining value of the limited partnerships' real estate assets.  ABC did not interview Goldstein; this decision, according to appellees, evidenced actual malice on ABC's part.  ABC also failed to interview on-camera any limited partner who voted in favor of the 1989 rollup.  This, appellees contend, showed that ABC entertained serious doubts as to the unfairness of the transaction.  Appellee's argument flows from the Supreme Court's decision in Connaughton, affirming a jury verdict for libel in part on evidence that a newspaper declined to interview a key witness.  491 U.S. at 692-93, 109 S. Ct. at

26

2698-99. But the salient facts in <u>Connaughton</u> presented a very different case.

In <u>Connaughton</u>, the newspaper used a single source as the basis for a highly improbable story that a candidate for judicial office had offered a bribe. <u>See</u> <u>id.</u> at 691-92, 109 S. Ct. at 2697-98. According to the source, the candidate had offered her and her sister a bribe (in the form of employment) during a conversation in his home at which five other people were present. Before it published the story, the newspaper spoke with the candidate, who had tape recorded the conversation, and the five other witnesses, all of whom squarely contradicted the source. The newspaper, however, neglected to listen to the tape recording, which the candidate made available. It also neglected to contact the source's sister, whom the source said would corroborate her version of the event. Under these facts, the Supreme Court held that the plaintiff had met his burden of establishing actual malice by clear and convincing evidence. <u>See</u> <u>id.</u> at 691-93, 109 S. Ct. at 2697-99.

The instant case is precisely the opposite of <u>Connaughton</u>. ABC had numerous sources telling it that the rollups were grossly unfair for the limited partners. <u>See</u> <u>Perk v. Reader's Digest Ass'n</u>, 931 F.2d 408, 411-12 (6th Cir. 1991) (distinguishing <u>Connaughton</u> on the ground that the article at issue was supported by the "overwhelming number of sources"). Given these sources, ABC was not required to continue its investigation until it found <u>somebody</u> who would stand up

27

for Levan. See Bressler v. Fortune Magazine, 971 F.2d 1226, 1233 (6th Cir. 1992). The law only required that ABC not proceed to publication while entertaining "serious doubts" as to the truth of the broadcast. St. Amant, 390 U.S. at 731, 88 S. Ct. at 1325.

ABC's choice not to include statements by limited partners voting for the transaction is similarly irrelevant. The decision to air the interview of one person but not another is at heart an editorial decision. See Miami Herald Publ'g Co. v. Tornillo, 418 U.S. 241, 94 S. Ct. 2831, 41 L. Ed. 2d 730 (1974); Newton v. National Broad. Co., 930 F.2d 662, 685-86 (9th Cir. 1990). ABC did acknowledge in its report that a majority of investors voted for the rollup; it was not required, however, to make this point as strongly as Levan would have. We came to a similar conclusion in Silvester v. American Broad. Co., 839 F.2d 1491 (11th Cir. 1988), which also involved ABC and the program 20/20. During the broadcast, ABC opined that one of its sources was "'a man with an axe to grind.'" Id. at 1498. The plaintiff claimed that this comment was insufficient; ABC should have informed its viewers that the source was unreliable. We disagreed, holding that ABC's comment was sufficient to alert viewers that the source "was not an unimpeachable source of information." Id.

It may be, as appellees contend, that there are meritorious reasons why a

28

limited partner would have voted for the rollups. It may also be that Levan and his attorney presented some of these reasons to ABC in their off-camera meetings. Stossel implicitly acknowledged as much; the report ended with Stossel telling anchorman Hugh Downs that some investors had made money from limited partnerships but then asking rhetorically whether it was worth the risk. The conclusion that it may not have been worth the risk is "not something that could be easily proved or disproved by the testimony of one individual," Perk, 931 F.2d at 412, and "[d]ifference of opinion as to the truth of a matter . . . does not alone constitute clear and convincing evidence that the defendant acted with a knowledge of falsity or with a 'high degree of awareness of . . . probable falsity.'" Connaughton, 491 U.S. at 681, 109 S. Ct. at 2693 (quoting Garrison v. Louisiana, 379 U.S. 64, 74, 85 S. Ct. 209, 216, 13 L. Ed. 2d 125 (1964)).

In sum, the evidence in the record before us, when considered in the light most favorable to appellees, was insufficient to demonstrate the existence of actual malice by clear and convincing evidence. In view of the vast number of objective sources who condemned the rollups as unfair to the limited partners, we conclude as a matter of law that ABC did not entertain serious doubts that the gist of its broadcast was true.

IV.

For the foregoing reasons, we VACATE the district court's judgment in favor of BFC and Levan, and REMAND the case with the instruction that the district court enter judgment in favor of Willson and ABC.

SO ORDERED.