[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

———————————

No. 01-10032

———————————

D. C. Docket No. 00-01386-CV-UUB

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 9, 2001
THOMAS K. KAHN
CLERK

RICHARD RUBIN,

Plaintiff-Appellant,

versus

U.S. NEWS & WORLD REPORT, INC.,
a Delaware corporation,
DAVID E. KAPLAN, individually,

Defendants-Appellees.

————————————————————————

Appeal from the United States District Court for
the Southern District of Florida

————————————————————————

**(November 9, 2001)**

Before TJOFLAT, CARNES and REAVLEY[*], Circuit Judges.

REAVLEY, Circuit Judge:

---

[*] Honorable Thomas M. Reavley, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

Plaintiff-appellant Richard Rubin appeals the dismissal of his libel claim against U.S. News and World Report (U.S. News) and David Kaplan. Rubin's claim was dismissed, with prejudice, on the pleadings. We affirm.

Rubin owned a gold-refining business in Miami. Apparently with his cooperation, U.S. News interviewed and photographed Rubin for an article it was preparing. The article, written by Kaplan, was entitled "The Golden Age of Crime: Why International drug traffickers are invading the global gold trade." It pointed out that much of the international gold trade was legitimate, but that much of it was not, and detailed schemes that drug traffickers used to launder their money by trading in gold.

Rubin brought this suit for libel under diversity jurisdiction. The district court dismissed, concluding that a "reasonable person would not interpret that Article in whole or in part, as being defamatory of Plaintiff." Rubin appeals.

*Legal Standards*

We review this dismissal for failure to state a claim *de novo*.[1]

---

[1] *See Grossman v. Nationsbank, N.A.,* 225 F.3d 1228, 1231 (11th Cir. 2000).

Under Florida law a private figure is entitled to recover in a defamation action if the defendant negligently broadcasts defamatory, false statements or statements with false and defamatory implications and the broadcast results in actual damage to the private figure.[2] Words are defamatory when they charge a person with an infamous crime or tend to subject one to hatred, distrust, ridicule, contempt or disgrace, or tend to injure one in one's business or profession.[3]

Where the court finds that "a communication could not possibly have a defamatory or harmful effect, the court is justified in dismissing the complaint for failure to state a cause of action."[4] On the other hand, if an allegedly defamatory publication is reasonably susceptible of two meanings, one of which is defamatory and one of which is not, it is for the trier of fact to determine the meaning understood by the average reader.[5] A statement is not defamatory unless the "gist"

---

[2] *See Hallmark Builders, Inc. v. Gaylord Broadcasting Co.*, 733 F.2d 1461, 1463 (11th Cir. 1984).

[3] *Adams v. News-Journal Corp.*, 84 So. 2d 549, 551 (Fla. 1955).

[4] *See Byrd v. Hustler Magazine*, 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983).

[5] *See Ford v. Rowland*, 562 So. 2d 731, 734 (Fla. Dist. Ct. App. 1990).

or "sting" of the statement is defamatory.[6] The gist of any statement within a publication or broadcast is found only by reference to the entire context.[7]

*The Article*

Rubin was mentioned three times in the article, first in a paragraph outlining the attraction of the gold trade to drug traffickers:

> The big surprise is that it took traffickers like Delgado so long to tumble to the allure of gold. The industry is largely made up of individual dealers and small companies that prefer to deal in cash. High tariffs on gold have attracted smugglers for years. "There's a dual economic system in the jewelry industry," concedes Richard Rubin, the owner of Republic Metals in Miami, a gold refiner. "There's on the books and there's off the books."

Rubin was mentioned again in a paragraph describing how Peruvian gold traders used the gold trade to commit tax fraud:

> A recent crackdown in Peru found that 40 percent of that nation's gold companies were bogus, set up largely to take advantage of an export-tax rebate. Smugglers shipped gold to American refiners, pocketed the tax rebate, smuggled the gold back to Peru, then shipped it out again,

---

[6] *See Smith v. Cuban American Nat'l Found*., 731 So. 2d 702, 706 (Fla. Dist. Ct. App. 1999).

[7] *See Levan v. Capital Cities/ABC, Inc*., 190 F.3d 1230, 1240 (11th Cir. 1999).

4

grabbing yet another rebate. "I may have handled gold coming in that was gold I sent down there to begin with," says Richard Rubin, whose Republic Metals made large shipments to and from Peru. Gold traders say the influence of narcotraffickers is so pervasive that they are taking over Latin America's gold trade, co-opting legitimate firms and buying up traders in country after country. "They're squeezing out the legitimate dealers," says one prominent trader who insisted on anonymity.

A photograph of Rubin also accompanies the article. He is pictured in a suit and tie, on the floor of his gold refinery, with his arm on a machine. There is a caption beneath the photo. Beneath the caption is an excerpted version of Rubin's earlier quote. Together they read:

Richard Rubin, owner of Republic Metals, on the floor of his Miami gold refinery (caption)
"*There's a dual economic system.... There's on the books and there's off the books*" (quote)

After the article was published, Rubin asked U.S. News for a retraction. In response, U.S. News published the following paragraph on its letters-to-the-editor page:

Clarification

The article "The Golden Age of Crime," which appeared in the Nov. 29, 1999, edition of the U.S. News & World Report, discussed how drug money is laundered through the purchase and resale of gold. The article includes quotes from an interview with Richard Rubin, the

5

owner of Republic Metal, a gold-refining business. U.S. News did not suggest and did not intend to suggest that Mr. Rubin or his company were engaged in money laundering, tax fraud, smuggling, or any other improper or illegal transactions discussed in the article, or that he or his company transacts business "off the books." U.S. News regrets if any reader misread the article to suggest such implications.

*Analysis*

Rubin does not contend that he was misquoted in the article, or that any individual statement in the article is false.[8] Because a statement must be false to be libelous, any damage to Rubin flowing from the article's uncontested statements-- that in the jewelry business there's "on the books and off the books," and that Rubin may have processed gold that was smuggled into Peru-- is not actionable. Instead, Rubin seeks to recover for damages flowing from two implications he

---

[8] Although counsel contested this point at oral argument, neither Rubin's complaint nor his initial brief alleged that he was misquoted or that any individual statement in the article was false. He does not contest the article's overall conclusion-- that the gold trade has become "the money laundering mechanism of choice." Nor does he contest the underlying truth of the statements he made. That is, he does not argue that it is untrue that in the jewelry business records are kept "on the books and off the books," nor does he argue that he may not have processed gold smuggled into Peru. Even were Rubin to contest the truth of these statements, his complaint would not state a claim that U.S. News failed to exercise reasonable care in publishing them, because Rubin can hardly argue that he is unqualified to comment on these issues. *See Miami Herald Publishing Co. v. Ane*, 458 So. 2d 239, 242 (Fla. 1984) (holding that negligence is an element in a defamation suit by a private figure in a matter of public concern); *Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1479-80 (S.D. Fla 1987) (holding that a media outlet has exercised due care when it repeats information from a reliable source without otherwise acting negligently.)

6

argues the article contains: 1) that Rubin processed gold that he knew had been smuggled, and 2) that Rubin himself kept two sets of books.

No reasonable reading of the text supports the implication that Rubin knowingly handled smuggled gold. Although the article takes care to detail the process by which smugglers commit tax fraud, no description of this process states that American gold refiners in general, or Rubin specifically, knowingly processed smuggled gold. Indeed, for the described scheme to work, tax cheats bringing gold into the United States would be forced to declare the shipment in order to claim their Peruvian export-tax rebate.[9] Rubin asserts that the article's comment that his company Republic Metals "made large shipments to and from Peru" implies that he knowingly handled smuggled gold. But that comment displays his expertise on the matter, and only explains Rubin's quote. Further, the statement by Rubin itself implies that he did not knowingly handle smuggled gold. He states that he "may" have handled smuggled gold, indicating that would not know whether he had processed smuggled gold.

As for the second implication-- that Rubin himself kept two sets of books-- Rubin contends that it is present in the paragraph describing why the gold trade is

_____

[9] As the article describes the scam, the gold is declared when it comes into the United States but smuggled back into Peru.

particularly suited to money laundering.  That paragraph first notes that gold

dealers prefer to deal in cash and that high tariffs on gold encourage smuggling.

Rubin is then quoted as follows:

> "There's a dual economic system in the jewelry industry," concedes
> Richard Rubin, the owner of Republic Metals in Miami, a gold
> refiner. "There's on the books and there's off the books."

Here Rubin points to the use of the word "concede" to support his claim.

The preferred meaning of this language is simply that Rubin accepts as true the

dual record keeping by some persons in the jewelry industry.  Rubin contends,

however, that it would be reasonable to conclude from this statement that he has

acknowledged grudgingly or hesitantly the existence of false books because,

perhaps, of his own culpable involvement.  To read the latter inference into the use

of "concede" we would expect to find some suggestion in this article that Rubin is

suspected or even accused of improper conduct.  Clearly, that is not what appears

here, for a reader could only see Rubin as a knowledgeable gold refiner who has

cooperated to be interviewed as a source of information on the industry.[10]

---

[10]  Rubin also argues that the use of his photograph, accompanied by the excerpt from his
statement, creates a defamatory implication.  But it is a common practice of magazines to show
photographs of those they quote merely for visual interest.  The inclusion of the quote beneath
the caption indicates why Rubin's photograph was included: to put a face to the quote.  And
nothing else in the article can reasonably be read to falsely defame Rubin; rather, it presents him
as an individual knowledgeable of the issues he is quoted on.  Accordingly, the photograph
carries no defamatory implication.

We agree with the district court that a reasonable person would not read the article to be defamatory to the plaintiff.[11]

AFFIRMED.

---

[11] Without reason to go further, we recognize that a First Amendment problem is encountered where a private figure complains that he has been defamed by implication in a communication containing only true facts. *See Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092-93 (4th Cir. 1993); *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990). *See also Dodds v. American Broadcasting Co., Inc.*, 145 F.3d 1053, 1064 (9th Cir. 1998) (applying high standard to claim of libel by implication of true facts in suit by public figure.) Even if the article were defamatory, Rubin would encounter this problem.

9