SALTER, J.
Jeff Greene appeals a final judgment and order dismissing his complaint against Times Publishing Company, Miami Herald Media Company, and three reporters for libel. Concluding that the complaint states a legally sufficient cause of action against each defendant, we reverse and remand the case to the circuit court for further proceedings.
I. Parties
Greene was a candidate for nomination as the Democratic candidate for election to the United States Senate in 2010. In mid-August 2010, about three weeks before the primary election for the nomination, the St. Petersburg Times, a newspaper and online publisher owned by defendant/ap-pellee Times Publishing Company, and The Miami Herald, a newspaper and online publisher owned by defendant/appellee Miami Herald Media Company, published three articles about Greene. Two of the pieces addressed Greene’s alleged role in a 2006 real estate deal in California. The third described various alleged activities involving Mike Tyson and Greene’s “mega yacht,” the “Summerwind,” during the period 2005-2007. The stories were published in print and online.
Greene provided pre-publication information and denials of certain information disclosed by the reporters, and he sent timely, written post-publication retraction demands pursuant to section 770.01, Florida Statutes (2010). As to the last article, Greene alleged, among other things, that he had no knowledge of whether Tyson was using illegal drugs in the summer of 2005 or 2007, that he paid for Tyson to go to rehabilitation when he later learned that Tyson was addicted, and that Tyson had publicly acknowledged that, but for Greene’s help, Tyson likely would have died from an overdose; But retractions were not forthcoming. Greene then sued Times Publishing, Herald Media, three individual and named reporters, and unnamed “John or Jane Does” that might have participated in the investigation, reporting, or editorial review regarding the three articles, in the circuit court in Miami.
II. The Articles and Alleged False, Defamatory, and Misleading Representations of Fact
The three articles are referred to in the complaint, dismissal order, and here as articles 1, 2, and 3. Articles 1 and 2 dealt with Greene’s 2006 real estate transactions at a 300-unit condominium property known as La Mirage in Ridgecrest, California. Article 3 reported Greene’s relationship with Mike Tyson and alleged activities in 2005-2007 aboard Greene’s “raucous party boat,” the “Summerwind.”
Article 1, “Calif. Deal Put Jeff Greene on Front Line of Mortgage Mess,” linked Greene to “mortgage shenanigans,” “massive fraud,” and “a man now under federal indictment.” The article recounted transactions in which a company owned by Greene sold all 300 Mirage condominiums in a single transaction to James Delbert McConville[1] in the summer of 2006. Al *727 though McConville had paid Greene’s company only $70,000 per unit, McConville apparently used escrowed deeds and straw transactions to sell the individual units at prices in the range of $145,000 to $165,000. McConville’s buyers obtained mortgage financing, defaulted on those loans, and left the buyers and lenders with substantial losses. The article reported that “half of McConville’s buyers were the same people who had purchased units from Greene.” In fact, Greene has alleged, no buyers except McConville purchased units from Greene’s company.
The complaint and its attachments, including the statutory retraction correspondence, detail thirteen “libelous statements”[2] in article 1 accusing Greene of selling the units to purchasers other than McConville directly at the inflated prices he never received, and of active participation in McConville’s criminal mortgage fraud.
Article 2, “Jeff Greene’s Real Estate Dealings Need Explaining,” was published on the editorial page by the Times two days after article 1. The article included numerous references to statements and topics in article 1, as well as new content. Representative statements in article 2 are:
The billionaire participated in a California real estate deal featuring the conversion of old apartments to condos, inflated sales prices to straw buyers and defaults that cost banks and taxpayers millions. The FBI is investigating, and it should talk to Greene.
[[Image here]]
Why are half of McConville’s buyers the same people who bought from Greene and who defaulted on all of the loans?[3]
[[Image here]]
Federal investigators should keep digging around Greene’s involvement in the failed development in the California desert. And Florida voters should not send to the U.S. Senate someone whose first line of defense is too often at odds with the facts.
Greene alleged that these and other specific allegations in article 2 were false and known to be false at the time they were made.
Article 3, published three days after article 2, was headlined “Jeff Greene Brushes off Raucous Party Boat Tales” in the Times and “Jeff Greene’s Yacht Holds the Secrets: Sexcapades or Sabbath?” in the Herald[4] The complaint and its attachments alleged that article 3 included several specific statements of fact that were false and defamatory: that Tyson, who was the best man at Greene’s wedding in 2007, had told Sports Illustrated about a summer “when he spent so much time with *728 Greene” that made that period of his life “sound more like the Love Boat [sic],” in St. Trope?;, Ibiza; Monte Carlo, and elsewhere, and about “getting high” with “naked girls.” The Times, Herald, and reporters were warned in writing and before publication that a number of the statements were false.
III. Motive and Allegations of Actual Malice
Greene alleged that the articles were published two weeks before the primary election in order to derail Greene’s nomination, with one of the individual defendants describing an early piece on Greene as a “hit job” or “hit piece,” and another having described her bias against Greene to third parties. Greene alleged that he invested over $24,000,000 of his own funds in his campaign for the nomination. He alleged that, prior to the publication of articles 1, 2, and 3, most polls indicated that Greene had a significant lead in the polls over his opponent, Kendrick Meek, and that his lead dropped to a double-digit deficit after publication of the articles. He lost the primary election. He also alleged that the allegedly-libelous statements damaged his reputation as a person and businessman.
As to each article, Greene alleged in the complaint that the allegedly-libelous statements were published without any privilege and with “actual malice, that is, with actual knowledge of falsity or with reckless disregard for truth or falsity.”
IV. Proceedings Below
Greene’s fifty-four page complaint referred to and attached eight documents (the articles and the statutory post-publication retraction demands). The defendants’ motions to dismiss[5] were extensively briefed and then heard by the trial court in August 2011. Thereafter, each side filed additional memoranda addressing the arguments advanced by the other. In April 2012, the trial court granted each defendant’s motion to dismiss, but authorized amendment of the complaint with respect to the allegations and libel claim against the corporate defendants relating to article 1. The dismissal rulings addressing articles 2 and 3 were with prejudice as to all defendants, and the motions to dismiss by the three reporters were granted with prejudice as to all three articles.
Greene then waived the limited right to amend granted in the order, the trial court entered a final judgment in favor of all defendants, and this appeal followed.

V.Analysis

Our review is de novo. We assume that all allegations in the complaint are true, and we construe all reasonable inferences from those allegations in favor of Greene. United Auto. Ins. Co. v. Law Offices of Michael I. Libman, 46 So.3d 1101, 1103-04 (Fla. 3d DCA 2010). That said, we acknowledge at the outset that the legal sufficiency of a libel complaint by a public figure against news media and reporters is subject to a more rigorous set of tests than a contract claim between private parties. First Amendment case law has, over the years, created such principles as the “substantial truth” doctrine[6] and protection for statements of “pure opinion.”[7] *729 “Actual malice” is also a rigorous standard for pleading purposes, as well as for proof.
The trial court correctly specified the five elements of a legally sufficient cause of action for libel involving a public figure: (1) publication, (2) falsity, (3) the defendant’s knowledge of, or reckless disregard for, the falsity (i.e., actual malice), (4) actual damages, and (5) the false statement must be defamatory. Jews for Jesus, Inc. v. Rapp, 997 So.2d 1098, 1106 (Fla.2008). In this case, publication is alleged (and is undisputed). The defendants’ knowledge or reckless disregard for alleged falsity is sufficiently pled, and actual damages are sufficiently pled as well.[8] The key elements in contention, therefore, are the falsity of certain statements in the articles and whether any such false statements were “defamatory.”
A. Falsity
According to the allegations and attachments, a number of statements in the articles are false. In articles 1 and 2, no individual purchasers bought condominium units from Greene, other than McCon-ville, and Greene did not sell any condominium units for the purchase prices listed in the articles. Nor was Greene “party to precisely the kind of deal that decimated the market,” according to the complaint. Nor did Greene participate in a California real estate deal with “inflated sales prices to straw buyers and defaults that cost banks and taxpayers millions.” According to the complaint and its attachments, McConville completed deeds signed in blank — provided under the “bulk” sale contract for all 300 condominium units to give effect to the “or assignees” feature of the agreement — which were then misused by McConville for his own scheme.[9] Qualifying phrases like “documents show” and “the records show” that Greene made the sales to straw buyers do not remedy the fact that, according to the complaint, no such transactions occurred and Greene received no funds from any such sales of individual units. If Greene’s allegations in the complaint are true, the sales records— settlement statements, payments to public property offices to record the deeds, and other documents — will also contradict the assertion in articles 1 and 2 that Greene participated in the fraudulent individual unit sales transactions.
In article 3, the complaint alleges that it is false that Tyson spent time with Greene aboard Greene’s yacht doing drugs and cavorting with naked women. References in article 3 to a “raucous party boat,” “the Love Boat,” and “Sexeapades” make it clear that Greene was being accused of participating in, or at the very least condoning, unlawful and immoral behavior.
Nor are these alleged falsehoods, which are illustrative rather than a comprehensive and complete list, protected as a matter of law by the “substantial truth” doctrine. The overarching impact of each *730 article, its “gist” or “sting,” [10] is a direct result of specific factual statements which, if the complaint is assumed to be true, are completely — not partially — false.
B. “Defamatory”
In Rubin v. U.S. News & World Report, Inc., 271 F.3d 1305 (11th Cir.2001), the court summarized the tests in Florida to assess whether a communication is defamatory:
Where the court finds that “a communication could not possibly have a defamatory or harmful effect, the court is justified in dismissing the complaint for failure to state a cause of action.” On the other hand, if an allegedly defamatory publication is reasonably susceptible of two meanings, one of which is defamatory and one of which is not, it is for the trier of fact to determine the meaning understood by the average reader. A statement is not defamatory unless the “gist” or “sting” of the statement is defamatory. The gist of any statement within a publication or broadcast is found only by reference to the entire context.
Id. at 1306 (footnotes omitted).
In the present case, the communications could, and allegedly did, have a defamatory or harmful effect. Various specific representations of fact in all three articles, as illustrated above, each considered in the context of the entire article, were not reasonably susceptible of a non-defamatory meaning — they directly portrayed Greene as a participant in criminal real estate and mortgage fraud, who needed to be investigated by the Federal Bureau of Investigation, and as a yacht owner who either took part in, or allowed his yacht to be used in, illegal drug use and “sexcapades.”
VI. Conclusion
We do not reach the appellees’ assertion that certain other statements in the articles may be non-actionable because they are accurately-reported statements of pure opinion by non-parties and are based on facts disclosed in the article. The actionable and provable false and defamatory statements, if any, will winnow out via pretrial discovery and motions for summary judgment.[11] We express no opinion regarding the accuracy of Greene’s allegations and his ability to prove them. We simply hold that, at the preliminary point of assessing the legal sufficiency of the complaint and attachments, Greene has adequately detailed a cause of action for libel as to each article and each defendant.
Reversed and remanded for further proceedings.

. The complaint alleges that Greene was unaware of fraud by McConville at the time Greene's company completed its sale to him. McConville was indicted by a federal grand jury in California in 2010 for fraud and money laundering relating to McConville's post- *727 purchase transactions regarding the Mirage condominium units. Greene’s complaint alleged that, through the time of publication of the articles and through the date of his complaint, he had not even been contacted by any law enforcement agency regarding the bulk sale from his company to McConville.

. The complaint clarified that one of the allegedly libelous statements, and a picture relating to it, were published by the Times, but not by the Herald.

. A question which "simply provokes public scrutiny of the plaintiff’s activities” would not be actionable; in this case, however, the question is reasonably read as an assertion of a false fact, according to the complaint — that Greene sold individual condominium units to persons who defaulted on loans. Chapin v. Knight-Ridder, Inc., 993 F.2d 1087, 1094 (4th Cir.1993).

.The Herald version of article 3 included, at one point, an "editor's note,” correcting certain information in the initial publication of the article.

.The Times and its reporters also moved to strike the complaint, but this motion became moot by virtue of the trial court’s order on the motions to dismiss and the final judgment.

. See Smith v. Cuban Am. Nat'l Found.., 731 So.2d 702, 706 (Fla. 3d DCA 1999).

. See Lipsig v. Ramlawi, 760 So.2d 170, 184 (Fla. 3d DCA 2000).

. The media defendants have argued that "courts should be loathe to become involved in post-election disputes,” and "money damages are not appropriate for lost elections.” As true as those assertions may ordinarily be, they have nothing to do with the allegations in the complaint. The complaint includes specific claims of damage to Greene’s business and reputation, as well as his claim that the articles nullified the $24,000,000 in personal funds he had invested in his campaign before publication. Greene’s complaint does not suggest that he suffered damages because he was deprived of the privileges and emoluments of office.

. The purchase contract between Greene's company and McConville, as well as the escrow agreement relating to the individual deeds, were attached to the retraction demand and the complaint.

. Smith v. Cuban Am. Nat’l Found., 731 So.2d 702, 706 (Fla. 3d DCA 1999).

. The significance of the procedural point at which we review claims for libel is aptly illustrated in comparing Barnes v. Horan, 841 So.2d 472 (Fla. 3d DCA 2002) (order of dismissal reversed), to Don King Productions, Inc. v. Walt Disney Co., 40 So.3d 40 (Fla. 4th DCA 2010) (summary judgment affirmed).