SUULUTAAQ, INC., and Samuel
Boyle, Plaintiffs,

v.

Lance WILLIAMS, Center for Investi-
gative Reporting, and San Fran-
cisco Chronicle, Defendants.

Case No. 3:10–cv–00048–TMB.

United States District Court,
D. Alaska.

Dec. 1, 2010.

Michael D. White, Patton Boggs LLP, Anchorage, AK, Andrew M. Friedman, Benjamin Gaillard Chew, Patton Boggs LLP, Washington, DC, for Plaintiffs.

Jon S. Dawson, Davis Wright Tremaine LLP, Anchorage, AK, Ambika K. Doran, Davis Wright Tremaine LLP, Seattle, WA, Thomas R. Burke, Davis Wright Tremaine LLP, San Francisco, CA, for Defendants.

## ORDER

TIMOTHY M. BURGESS, District Judge.

Defendants Lance Williams, Center for Investigative Reporting ("CIR"), and the San Francisco Chronicle (the "Chronicle") have moved for judgment on the pleadings requesting that the Court dismiss Plaintiffs Suulutaaq, Inc. ("Suulutaaq") and Samuel Boyle's claims for defamation.[1] For the reasons discussed below, Defendants' motion is GRANTED, in part, and DENIED, in part. Defendants related request for a hearing [2] is DENIED.

## I. BACKGROUND

### A. Suulutaaq and the Section 8(a) Program

Suulutaaq is an Alaska Native Corporation ("ANC") that pursues federal contracts under § 8(a) of the Small Business Act.[3] Section 8(a) tasks the federal government with "negotiating or otherwise letting [procurement contracts] to socially and economically disadvantaged small business concerns" to supply various goods and services.[4] The § 8(a) program is intended "to help small businesses owned and controlled by socially and economically

---

**1.** Dkts. 24, 26. The Court notes that Defendants' motion papers included a "Chart of Statements Challenged by Plaintiffs." *See* Dkt. 24-1. This appears to have been a means of avoiding the page limit under the applicable Local Rules provision when the document was filed, which the Court does not appreciate. *See* L. Civ. R. 10.1(m) (previously limiting moving memoranda to 25 pages). The Court could strike the Chart in these circumstances, however, as the information is not dispositive here, the Court will refrain from striking the Chart in this instance.

**2.** Dkt. 48.

**3.** Dkt. 1 ¶ 1; *see also* 15 U.S.C. § 637(a). As the Court understands it, Suulutaaq eligible for the § 8(a) program because it is technically a "[s]mall business concern[ ] owned and controlled by" an ANC. *See* 13 C.F.R. § 124.1; Dkt. 21 (indicating that Suulutaaq is 80% owned by TKC Development, Inc., which "is a wholly owned subsidiary of The Kushokwim Corporation ... an Alaska Native Village Corporation formed pursuant to the Alaska Native Claims Settlement Act.").

**4.** 15 U.S.C. § 637(1)(B).

disadvantaged individuals [and groups] . . . including Alaska Native Corporations . . . to compete on an equal basis in the mainstream of the economy." [5] Under the program, the government places projects in the § 8(a) program and awards the contracts to eligible contractors. The government may award qualifying § 8(a) contracts—including contracts awarded to ANCs [6]—without competitive bidding.[7] Regardless, however, § 8(a) contracts must not exceed "a fair market price." [8]

Regulations restrict the contact that government officials may have with § 8(a) contractors,[9] however, they do provide that the contractors may "influence" the process through "self-marketing." [10] Under the "self-marketing" rules, § 8(a) contractors may contact agency personnel and market their services for projects that they are capable of performing.[11]

Consistent with the goals of the program, Suulutaaq began pursing § 8(a) contracts "shortly after its inception . . . in order to ultimately alleviate some of the economic disadvantage and poverty in the isolated and rural villages of its region and to fund further cultural preservation." [12]

### B. Boyle

Boyle is the CEO for one of Suulutaaq's affiliates, TKC Aerospace, and served as "the transitional CEO" for Suulutaaq during a "reorganization" period that lasted less than one year.[13] Boyle has "extensive business management experience," [14] including consulting work where he advised companies on "their strategies, processes, business plans and operational execution." [15] His prior experience included working with "government contractors" and "government agencies" on "long-term projects." [16] This background provided him with "insight into federal contracting." [17] Boyle also has "substantial experience in the Aerospace Industry" but does not have "specific construction experience." [18] He lived in Alaska for several years during the 1980s, and currently resides in South Carolina.[19]

Prior to joining TKC Aerospace, Boyle was the CEO of Sailnet, a "dot-com" business.[20] Sailnet declared bankruptcy in July 2005, approximately seven months after Boyle left the company.[21] Before do-

---

5. *Jet Investment, Inc. v. Dep't of the Army*, 84 F.3d 1137, 1138 n. 1 (9th Cir.1996) (citation omitted).

6. 48 C.F.R. § 19.805–1(b)(2); *see also* 13 C.F.R. § 124.506.

7. *See* § 19.805–1. The courts have recognized that "[t]here is no constitutional duty to offer government procurement contracts for competitive bidding." *Ray Baillie Trash Hauling, Inc. v. Kleppe*, 477 F.2d 696, 709 (5th Cir. 1973).

8. § 19.806(b).

9. *See* 48 C.F.R. §§ 3.104–1, –9, & 3.201–04.

10. *Enplanar, Inc. v. Marsh*, 11 F.3d 1284, 1287 n. 1 (5th Cir.1994).

11. *Id.* (citing 48 C.F.R. §§ 19.803(c), 19.804–2(a)(12)); *see also* 13 C.F.R. § 124.3 (defining "self-marketing").

12. Dkt. 44 Ex. A at 1–2.

13. Dkt. 1 ¶ 2.

14. *Id.* ¶ 23.

15. Dkt. 25 Ex. B at 2.

16. *Id.*

17. *Id.* at 2–3.

18. Dkt. 44 Ex. A at 3–4.

19. Dkt. 1 ¶ 2; Dkt. 25 Ex. B at 2.

20. Dkt. 1 ¶¶ 20, 22; Dkt. 25 Ex. B at 3.

21. Dkt. 1 ¶ 22; Dkt. 25 Ex. B at 1.

ing so, Sailnet spent approximately $13 million in venture capital.[22] Boyle and his family personally lost everything that they had invested in Sailnet when it went bankrupt.[23]

After leaving Sailnet, Boyle performed some consulting work for TKC Aerospace.[24] He was then asked to become the CEO in June 2005.[25] In March 2009, he was asked to become the transitional President of Suulutaaq.[26]

### C. The Napa Flood Control Project

This dispute centers around a flood control construction project in Napa Valley, California.[27] Suulutaaq won the contract and has been working on it as the prime contractor.[28] It is unclear how Suulutaaq became aware of the Napa Valley Flood Control Project, however, it may have been through an email from the U.S. Army Corps of Engineers notifying it of the opportunity and inviting it to participate in the procurement process.[29] According to Suulutaaq, this is a typical procedure where an agency identifies an opportunity as a set aside under § 8(a) or other similar programs.[30] Suulutaaq asserts that it:

> cannot find any evidence suggesting that Suulutaaq, either directly or indirectly through others, made any attempt at any time to influence the U.S. Army

Corps of Engineers, the Napa Valley Flood District, the City of Napa or any other local, state or federal employee, agency or legislator to determine that the Napa Valley Flood Control Project should be: 1) a set aside of any kind or 2) reserved for Suulutaaq in any manner.[31]

Suulutaaq has subcontracted out some of the work on the Napa Flood Control Project, but is exceeding the 15% self-performance minimum requirement under the § 8(a) program.[32]

### D. Defendants and the Allegedly Defamatory Article

Williams is a reporter who wrote an article about the Napa project (the "Article"), which contains the allegedly defamatory statements.[33] CIR is "an investigative news reporting organization" that founded "California Watch," a subsidiary that employs Williams.[34] CIR published the Article on California Watch's website.[35] The Chronicle is one of the largest daily newspapers in the United States and previously employed Williams.[36] It published the Article on the front page of its print edition on January 31, 2010, and on its website.[37] All of the Defendants are based in California.[38]

The Parties agree that the three published versions of the Article are substantially similar in all material respects.[39]

---

22. Dkt. 1 ¶¶ 20–22.

23. *Id.* ¶ 22.

24. Dkt. 25 Ex. B at 3.

25. *Id.*

26. *Id.*

27. Dkt. 1 ¶ 1.

28. *Id.*

29. Dkt. 44 Ex. A at 4.

30. *Id.*

31. *Id.* at 2.

32. *Id.* at 5–6.

33. Dkt. 1 ¶¶ 3, 9.

34. *Id.* ¶ 4.

35. *Id.* ¶ 10.

36. *Id.* ¶¶ 5, 9.

37. *Id.* ¶¶ 11–12.

38. *Id.* ¶¶ 3–5.

39. Dkt. 24 at 2 (citing Dkt. 1 ¶¶ 10–12 and Dkt. 1 Exs. A–C). For the purposes of this opinion, the Court will refer to Complaint

The Article characterizes Suulutaaq as an "unusual construction company" that "won a $54 million federal contract" without competitive bidding.[40] The Article refers to the Napa project as the "Wine Train project," because the project involves constructing a new railroad bridge for the privately-owned "Napa Valley Wine Train tourist attraction."[41] It states that the project has been "significantly" more expensive because "accommodating the Wine Train was politically necessary" in order to get the project approved.[42]

The Article also refers to the Napa contract as a "federal stimulus contract" and notes that the project was criticized by two Senators as being " 'silly and shortsighted' and a waste of money."[43] It states that the Senators had "suggested" that the project was not creating many new jobs, but quoted "[o]fficials involved with the project" as saying that they expected that the project would eventually "create as many as 200 jobs when work ramps up."[44] A construction executive from a rival firm, Robert G. Brosamer, is quoted as suggesting that the Government "overspent by millions when it negotiated [the] contract with Suulutaaq rather than seeking competitive bids."[45] He is also later quoted as saying that the project would have been cheaper if it had been put "out to bid," and that as a consequence, the public was paying a premium for it.[46] More specifically, the Article indicates that the Army Corps

of Engineers initially awarded "a $6.2 million contract ... to begin work" on the project in September 2008.[47] After "the federal stimulus program was announced," however, the Army Corps of Engineers recommended the project for stimulus funding, and "[w]ith the support of U.S. Rep. Mike Thompson, D–St. Helena, $54 million also went to Suulutaaq."[48]

The local construction executive is quoted as stating that the actual construction is "first rate" and the Article indicates that local officials are "pleased" with the work.[49] However, it also quotes the executive as saying that "Suulutaaq isn't doing much" work on the project, and indicates that Suulutaaq subcontracted out "much of the job," but is retaining 38 percent of the contract price.[50] Suulutaaq is quoted as stating that taxpayers are "getting a 'fair and reasonable' price" for the work.[51]

The Article also indicates that Suulutaaq "rebuffed a query about whether Suulutaaq employed lobbyists by asserting that the question 'has potential undertones of a race-based presumption.' "[52] It describes the § 8(a) program as being "a preferential contracting program to aid disadvantaged businesses" that allows "[q]ualifying firms [to] get federal contracts worth up to $5.5 million by negotiation, rather than competitive bidding."[53] It further indicates that ANCs "emerged as players in federal contracting via measures crafted in

---

Exhibit C, which is a copy of the version posted on the Chronicle's website. *See* Dkt. 4 Ex. C.

40. Dkt. 4 Ex. C at 1.

41. *Id.* at 1, 4–5.

42. *Id.* at 4–5.

43. *Id.* at 1.

44. *Id.*

45. *Id.* at 2.

46. *Id.* at 5.

47. *Id.*

48. *Id.*

49. *Id.* at 1, 5.

50. *Id.* at 5.

51. *Id.* at 2.

52. *Id.*

53. *Id.*

the 1980s and 1990s by former Sen. Ted Stevens, R–Alaska, a powerful lawmaker whose career ended with a contracting scandal." [54] These measures gave ANCs "special access" to § 8(a) contracts, "with no cap on the size of contracts they can obtain." [55] The Article indicates that some support the measures as a means of "redressing centuries of grievous wrongs" against Alaskan tribes, while "critics," such as Senator Claire McCaskill, argue that they "provide relatively few jobs and little investment income to tribes while costing taxpayers a fortune." [56] It states that Senator McCaskill proposed "a cap on the no-bid contracts, but the measure stalled in the face of intense lobbying by tribal corporations." [57]

The Article also discusses Suulutaaq and Boyle's background. It indicates that Suulutaaq was formed in 1977 to develop a goldfield near the Kuskokwim River.[58] Beginning in 2006, Suulutaaq obtained federal contracts to "replace a sewage pump" at an Airforce base, "rebuild meat lockers in Honolulu for the U.S. Defense Commissary Agency," and various other projects, most of which "were outside Alaska." [59] It further indicates that Suulutaaq's affiliates have also obtained "no-bid" federal contracts.[60]

The Article indicates that Boyle's "previous multimillion-dollar venture," Sailnet, "collapsed in bankruptcy." [61] It states that

Sailnet investors were "surprised" to learn that Boyle was the CEO of Suulutaaq because he "did not mention having construction experience or ties to Alaska tribes." [62] One "aggrieved" investor is quoted as saying, "if Sam Boyle is involved, watch out." [63] It states that "[u]nder Boyle, Sailnet burned through more than $13 million in venture capital." [64] The Article indicates that Boyle stated that Sailnet's "bankruptcy was 'a tragedy' for which he was not responsible because he had left the company by the time it occurred." [65] The Article later notes that Boyle described himself "as a former government consultant for government agencies and said he lived in Alaska for four years in the early 1980s." [66] It states that he previously indicated that "he was a marketing expert with a background in Air Force logistics." [67]

### E. Plaintiffs' Allegations

Plaintiffs allege that the Article defames them because it makes false statements and "lead[s] ordinary readers to false and defamatory conclusions" by "juxtaposing statements" and "omitting material facts." [68] Plaintiffs claim that the Article defames Suulutaaq because it leads ordinary readers to conclude that: Suulutaaq does not deserve any federal contracts, including the Napa contract; that the Government is overpaying for the Napa pro-

54. *Id.*

55. *Id.*

56. *Id.* at 2–3.

57. *Id.* at 3.

58. *Id.*

59. *Id.*

60. *Id.* at 3–4.

61. *Id.* at 1.

62. *Id.* at 2.

63. *Id.*

64. *Id.* at 4.

65. *Id.* at 2.

66. *Id.* at 3.

67. *Id.* at 3–4.

68. Dkt. 1 ¶ 13.

ject; Suulutaaq is not competent to perform the Napa contract; Suulutaaq has done "almost no work" on the Napa project while retaining a large percentage of the funds; and "only won the Napa Contract by manipulating federal laws and regulations related to ANCs and by violating federal lobbying laws and regulations."[69] Plaintiffs claim that the Article defames Boyle because it "leads ordinary readers to conclude" that Boyle is incompetent, dishonest, and both "violated" and "manipulated" federal lobbying laws and regulations to help win federal contracts for Suulutaaq.[70] Plaintiffs further note that they provided written answers to Williams' questions before the Article was published but that the Article "consistently omits and mischaracterizes the facts provided by the Plaintiffs."[71]

More specifically, Plaintiffs allege that the Article leads readers to reach the following false conclusions about Suulutaaq:

- That it "does not deserve the Napa Contract, and only received it as an affirmative action set-aside" because the Article states that as an ANC, Suulutaaq "enjoys special access to federal contracts" which is "how it obtained" the Napa contract.[72]

- That Suulutaaq violated "federal lobbying statutes and regulations" and "used illicit means to obtain the Napa Contract" because the Article discusses tribal corporations hiring consultants with "connections" to obtain federal contracts and omits Suulutaaq's statement that it did not attempt to influence any officials in obtaining the Napa contract.[73]

- That Suulutaaq violated federal lobbying laws and illegally obtained the Napa contract because of the statement that ANCs "emerged as players in federal contracting" thanks to "measures crafted . . . by former U.S. Sen. Ted Stevens, a powerful lawmaker whose career ended with a contracting scandal."[74]

- That Suulutaaq is not qualified to perform the Napa contract and only received it as "an affirmative action set-aside" because the Article discusses Suulutaaq's prior projects (including developing a goldfield, replacing a sewage pump, rebuilding meat lockers) without discussing its "extensive experience relevant to" the Napa project.[75]

- That Suulutaaq "obtained . . . stimulus funding by illicit means, in violation of federal lobbying statutes and regulations" because it indicated that Congressman Thompson helped obtain "$54 million in stimulus funds" for the Napa project after Suulutaaq won the contract.[76]

- That Suulutaaq is not competent to perform the Napa contract and violated federal law "by hiring an excessive number of subcontractors" due to the Brosamer's quotes indicating that Suulutaaq "isn't doing much" and subcontracted out "much of the job" despite the fact that the Article also states that "Suulutaaq said the company was complying with federal law regarding hiring subcontractors."[77]

69. *Id.* ¶ 16.

70. *Id.* ¶ 14.

71. *Id.* ¶ 19.

72. *Id.* ¶¶ 26–27.

73. *Id.* ¶¶ 28–30.

74. *Id.* ¶¶ 31–32.

75. *Id.* ¶¶ 33–34.

76. *Id.* ¶¶ 35–37.

77. *Id.* ¶¶ 38–40.

- That the government "overpaid for the Napa Contract" and that "Suulutaaq is unjustifiably 'keeping' . . . unearned profits after subcontracting out all the work" because of Brosamer's statement that it would have been "cheaper" if the Army Corps had put the contract "out to bid" and the statement that Suulutaaq is "keeping" 38 percent of the contract price without stating that it is "performing over 40% of the work on the Napa Contract." [78]

Plaintiffs further contend that the Article leads readers to reach the following false conclusions about Boyle:

- That Boyle is incompetent, dishonest, and "conned people into investing in Sailnet" which he "personally caused . . . to fail" because of the quotes from investors stating that they "would not invest" money with Boyle and that he is a "lousy businessman," as well as the statement that Sailnet "burned through 13 million in venture capital . . . but . . . never made a profit." [79]
- That the Article "falsely places all the blame for Sailnet's bankruptcy at Mr. Boyle's feet" because it omits information Boyle provided to Williams explaining that he "simply followed" instructions from Sailnet's board of directors, that Sailnet was not in danger of going bankrupt when he left the company, that many other "dot-com" ventures went bankrupt in the same time frame, and that Boyle is personally "grieved by the failure of

Sailnet, as he and his wife also lost everything they put into the venture." [80]
- That Boyle's "sole value to Suulutaaq is an ability to obtain undeserved federal contracts through illicit means, in violation of federal lobbying statutes and regulations" because it identifies Boyle as being "a former consultant for government agencies" and as working for TKC Aerospace which "obtained $117 million" in contracts without mentioning any of the details of those contracts.[81]

## II. LEGAL STANDARD

Courts evaluate Rule 12(c) motions for judgment on the pleadings under the same standard that applies to motions to dismiss for failure to state a claim upon which relief may be granted under Rule 12(b)(6).[82] When considering a motion to dismiss for failure to state a claim, courts generally assume that all allegations in the complaint are true, even if doubtful in fact.[83] A complaint must set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." [84] In order to survive a motion to dismiss, a complaint must include "[f]actual allegations [that are] enough to raise a right to relief above the speculative level." [85] In order to do so, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " [86] In determining

78. *Id.* ¶¶ 41–42.

79. *Id.* ¶¶ 20–21.

80. *Id.* ¶ 22.

81. *Id.* ¶¶ 23–24.

82. *Pacific W. Group, Inc. v. Real Time Solutions, Inc.,* 321 Fed.Appx. 566, 569 (9th Cir. 2008) (citing *Dworkin v. Hustler Magazine, Inc.,* 867 F.2d 1188, 1192 (9th Cir.1989)).

83. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).

84. Fed.R.Civ.P. 8(a)(1).

85. *Twombly,* 550 U.S. at 555, 127 S.Ct. 1955.

86. *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Twombly,* 550 U.S. at 556–57, 127 S.Ct. 1955).

whether a complaint pleads sufficient facts to cross "the line between possibility and plausibility," courts may disregard "[t]hreadbare" legal conclusions.[87] Then courts should determine whether the well-pleaded allegations "plausibly establish" the claims or whether they fail in light of "more likely explanations."[88] However, a plaintiff need not plead "all facts necessary to carry" his or her burden.[89] "Determining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[90]

In defamation actions, the Ninth Circuit has suggested that "more specific allegations than are otherwise required" are necessary in order to ensure that the action will not chill the exercise of First Amendment rights.[91] Courts have suggested that a plaintiff must allege the "precise statements alleged to be false and defamatory, who made them and when" in order to satisfy this standard.[92]

## III. DISCUSSION

 Under Alaska law,[93] "[t]he elements of a defamation claim are: (1) a false and defamatory statement; (2) unprivileged publication to a third party; (3) fault amounting at least to negligence; and (4) either per se actionability or special reputation of another so as to lower [the plaintiffs] in the estimation of the community or deter third persons from associating or dealing with" the plaintiffs.[94] Defenses to a defamation claim include truth and privilege.[95] On this motion, Defendants argue that the statements are not reasonably susceptible to a defamatory meaning, are substantially true, and are protected by the "fair report" privilege.[96]

Defendants have proffered various materials outside of the pleadings in support of their motions.[97] These include the written statements provided by Plaintiffs to Williams before the Defendants published the Article and materials Williams asserts he obtained off of government websites provided in support of Defendants' privilege defense. The Court will first evaluate

---

**87.** *Id.* (citing *Twombly*, 550 U.S. at 555, 557, 127 S.Ct. 1955).

**88.** *Id.* at 1949, 1951.

**89.** *Al–Kidd v. Ashcroft*, 580 F.3d 949, 977 (9th Cir.2009), *cert. granted* —— U.S. ——, 131 S.Ct. 415, 178 L.Ed.2d 321 (2010).

**90.** *Iqbal*, 129 S.Ct. at 1950 (citation omitted).

**91.** *Harris v. City of Seattle*, No. C02–2225P, 2003 WL 1045718, at *3 (W.D.Wash. Mar. 3, 2003) (quoting *Flowers v. Carville*, 310 F.3d 1118, 1130 (9th Cir.2002)).

**92.** *Id.* (quoting *Flowers*, 310 F.3d at 1131).

**93.** The Parties agree that Alaska law controls. *See, e.g.*, Dkt. 24 at 7 (discussing how Alaska courts have treated defamation claims); Dkt. 44 at 19 (similar).

**94.** *State v. Carpenter*, 171 P.3d 41, 51 (Alaska 2007) (citation omitted).

**95.** *Spence v. Southeastern Alaska Pilots' Assoc.*, 789 F.Supp. 1014, 1028 (D.Alaska 1992) (citing *Green v. Northern Publ'g Co.*, 655 P.2d 736, 740 (Alaska 1982)); *see also Fairbanks Publ'g Co. v. Francisco*, 390 P.2d 784, 793 (Alaska 1964) (recognizing "the conditional privilege accorded by law to newspapers to publish the report of a government official, even though the report may contain false and defamatory matter" so long as the publication is "an accurate and complete account of the contents of the report"); *Fairbanks Publ'g Co. v. Pitka*, 376 P.2d 190, 192–93 (Alaska 1962) (stating that truth of a factual statement is "a complete defense to an action for defamation"); *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1054 (9th Cir.1990) (indicating that statements that are "substantially true" are not actionable).

**96.** Dkt. 24.

**97.** *See* Dkt. 25.

whether it may consider these materials before turning to the sufficiency of Plaintiffs' Complaint.

### A. Materials Outside the Pleadings

■ Generally, the court should not consider materials outside of the pleadings when ruling on a motion to dismiss or a motion for judgment on the pleadings.[98] To that end, Rule 12(d) provides that:

> If, on a motion under Rule 12(b)(6) or Rule 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.[99]

However, there are two exceptions to this general rule.[100] First, courts may consider materials submitted with or relied on by the complaint, even if they are not physically attached to the complaint, where their authenticity is not disputed.[101] Second, courts may take judicial notice of matters of public record under Federal Rule of Evidence 201.[102] This exception applies to undisputed matters of public record, as opposed to disputed facts stated in public records.[103]

Here, the Parties do not dispute the authenticity or relevance of the statements Plaintiffs sent to Williams in response to his questions.[104] Plaintiffs repeatedly refer to these statements in their Complaint.[105] Accordingly, the Court may properly consider the statements in deciding this motion without converting it into a motion for summary judgment.

The Parties disagree as to whether the Court may take judicial notice of the materials that Williams obtained from government websites.[106] The Parties direct the Court to various decisions where other courts have or have not taken judicial notice of information posted on government websites.[107] Defendants contend that they are not requesting that the Court to "assume the truth of the facts in the public records."[108] Rather, Defendants argue that the fact that Williams obtained the information off of these websites allows Defendants to assert the "fair report privi-

---

98. See *Arpin v. Santa Clara Valley Transp. Agency,* 261 F.3d 912, 925 (9th Cir.2001).

99. Fed.R.Civ.P. 12(d).

100. *San Francisco Patrol Special Police Officers v. City & Cnty. of S.F.,* 13 Fed.Appx. 670, 675 (9th Cir.2001) (citing *Lee v. City of L.A.,* 250 F.3d 668, 688 (9th Cir.2001), *overruled on other grounds by Galbraith v. County of Santa Clara,* 307 F.3d 1119, 1125–26 (9th Cir.2002)).

101. *Id.* (citing *Lee,* 250 F.3d at 688).

102. *Id.* (citing *Lee,* 250 F.3d at 689).

103. *Lee,* 250 F.3d at 690.

104. Dkt. 25 Ex. A–B; Dkt. 44 Ex. A.

105. Dkt. 1 ¶¶ 19, 22, 28, 30, 36–37, 39–40, 47, 52.

106. See Dkt. 25 ¶¶ 5–10.

107. See Dkt. 49 at 7–8 (citing *Gent v. CUNA Mut. Ins. Soc.,* 611 F.3d 79, 84 n. 5 (1st Cir.2010) (taking judicial notice of facts on government agency website which the parties had cited "as authoritative"), *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.,* 565 F.3d 683, 702 n. 22 (10th Cir.2009) (taking judicial notice of facts referenced in two government agency websites), and *Coleman v. Dretke,* 409 F.3d 665, 667 (5th Cir.2005) (taking judicial notice of substantive information on a state agency website)); Dkt. 44 at 10 (citing *Experian Info. Sol., Inc. v. Lifelock, Inc.,* 633 F.Supp.2d 1104, 1107 (C.D.Cal. 2009) (declining request to take judicial notice of material on the Governor of Connecticut's website because the material was "not 'capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned' ")).

108. Dkt. 49 at 3, n. 2.

lege," which Defendants contend permits them to "print fair and accurate summaries" of this "public record" material.[109]

The problem with Defendants' request here is not that they are requesting the Court to "assume the truth" of this information. Rather, the problem is that even if the information does appear in the public record, that does not establish that Defendants relied on it, which would be necessary in order for them to assert the fair report privilege.[110] After discovery, that reliance may not be reasonably disputed, however, it is not something "generally known" or "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."[111] Accordingly, Defendants' request that the Court take judicial notice of information appearing on various government websites is denied without prejudice. Defendants are free to renew this request after establishing the necessary predicate that would make this information relevant.[112]

## B. False by Implication Claims

In order to survive a motion to dismiss, a defamation plaintiff must establish that the statements at issue "are 'reasonably capable of sustaining a defamatory meaning.'"[113] A statement is defamatory if it has a "general tendency" to cause harm to the plaintiff's reputation.[114] Generally, "actionable" defamatory statements are thought to "make the plaintiff appear odious, infamous, or ridiculous'"[115] or "charge a person with an infamous crime,"[116] as opposed to statements that are "[m]erely offensive or unpleasant."[117]

The defamatory meaning may be explicit or implied.[118] A reasonable defamatory interpretation is sufficient to create a triable issue of fact even if the statement is also reasonably susceptible of a non-defamatory interpretation.[119] In determining whether a statement is reasonably susceptible of a defamatory interpretation, the court "must interpret the statement 'from the standpoint of the av-

109. *See* Dkt. 24 at 23

110. *Cf. Bufalino v. Associated Press*, 692 F.2d 266, 270–71 (2d Cir.1982) (finding that although the fair report privilege does not require first hand knowledge of government records, it does require that the defendant actually rely on the substance of the records prior to publication).

111. Fed.R.Evid. 201.

112. As Plaintiffs also note, Defendants have also not explained exactly where on the various government websites they obtained the exact information attached to Williams' declaration. *See* Dkt. 25.

113. *Knievel v. ESPN*, 393 F.3d 1068, 1073–74 (9th Cir.2005) (citations omitted).

114. *State v. Carpenter*, 171 P.3d 41, 51 (Alaska 2007) (citation omitted); *see also Green v. Northern Publ'g Co.*, 655 P.2d 736, 739 (Alaska 1982) ("A communication is defamatory if it tends to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating or dealing with him") (quoting Restatement (Second) of Torts § 559 (1977)).

115. *Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir.1993) (citation omitted); *see also* Restatement (Second) of Torts § 559 cmt. b ("Communications are often defamatory because they tend to expose another to hatred, ridicule or contempt.").

116. *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1306 (11th Cir.2001).

117. *Chapin*, 993 F.2d at 1092 (citations omitted); *see also USA Techs., Inc. v. Doe*, 713 F.Supp.2d 901, 908 (N.D.Cal.2010) (statements that are "merely annoying or embarrassing" are not defamatory).

118. *See Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir.2010) (citing *Forsher v. Bugliosi*, 26 Cal.3d 792, 803, 163 Cal.Rptr. 628, 608 P.2d 716 (1980)).

119. *Kinzel v. Discovery Drilling, Inc.*, 93 P.3d 427, 440–41 (Alaska 2004).

erage reader, judging the statement not in isolation, but within the context in which it is made.' " [120] Thus, minor inaccuracies do not give rise to a defamation claim where the article accurately conveys the "gist" or "sting" of the matter.[121] At the same time, omitted or juxtaposed facts can make a statement susceptible of a defamatory interpretation, even if individual statements are "true" when viewed in isolation.[122] The Court may resolve this issue as a matter of law.[123]

■■■■ Beyond state law, the First Amendment protects " 'pure' opinions" which "do not imply facts capable of being proven true or false" from forming the basis of a defamation claim, but does not protect statements that "imply a false assertion of fact . . . even if . . . couched as a statement of 'opinion.' " [124] The Ninth Circuit has set forth the following factors to help resolve the "threshold question" of whether statements fall within this protection:

(1) whether the general tenor of the entire work negates the impression that the defendant was asserting an objective fact, (2) whether the defendant used figurative or hyperbolic language that negates the impression, and (3) whether the statement in question is susceptible of being proved true or false.[125]

Similarly, when an author explains the factual basis for his or her opinion, the statement is protected by the First Amendment.[126]

Under these standards, the Ninth Circuit has held that statements questioning a lawyer's performance during trial were non-actionable because they were "inherently subjective." [127] In that same case, the court expressed approval for the District of Columbia Circuit's finding that statements indicating that a journalist was incompetent or "sloppy" were not actionable.[128] Similarly, the Ninth Circuit has also held that accusations of "dishonesty" and "ignoran[ce]" may be protected if they do not suggest specific criminal or other wrongful acts.[129]

**120.** *Knievel v. ESPN*, 393 F.3d 1068, 1074 (9th Cir.2005).

**121.** *Harris v. City of Seattle*, No. C02–2225P, 2003 WL 1045718, at *3 (W.D.Wash. Mar. 3, 2003) (quoting *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 982 (9th Cir. 2002)); *Rubin v. U.S. News & World Report, Inc.*, 271 F.3d 1305, 1306 (11th Cir.2001); *Chapin v. Knight–Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir.1993) (citations omitted).

**122.** *See Sisemore v. U.S. News & World Report, Inc.*, 662 F.Supp. 1529, 1531 (D.Alaska 1987) (Kleinfeld, J.) (citing *Empire Prtg. Co. v. Roden*, 247 F.2d 8, 14 (9th Cir.1957)); *see also, e.g., Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 114–17 (Tex.2000) (indicating that an article that correctly conveys the "gist" or "sting" of a story while erring in the details does not give rise to liability, but a story that correctly conveys the details while getting the "gist" wrong by taking them out of their proper context does create liability); *Price v. Stossel*, 620 F.3d 992, 1003 (9th Cir. 2010); *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 984–85 (9th Cir.2002);

*Toney v. WCCO Television*, 85 F.3d 383, 386–87 (8th Cir.1996).

**123.** *Knievel*, 393 F.3d at 1074.

**124.** *Gardner v. Martino*, 563 F.3d 981, 986 (9th Cir.2009) (quoting *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 19, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)).

**125.** *Id.* at 987 (citing *Partington v. Bugliosi*, 56 F.3d 1147, 1152 (9th Cir.1995)).

**126.** *Partington*, 56 F.3d at 1156–57 (citations omitted).

**127.** *Id.*

**128.** *Id.* at 1159 (citing *Moldea v. New York Times Co.*, 22 F.3d 310, 316–17 (D.C.Cir. 1994)).

**129.** *Standing Committee on Discipline of the U.S. Dist. Ct. for the C.D. Cal. v. Yagman*, 55 F.3d 1430, 1440 (9th Cir.1995).

The Constitution also provides some protection for parties who repeat statements made by others. Generally, "a person who repeats a defamatory statement is . . . as liable as the one who first utters it."[130] However, where the plaintiff is a public figure, parties may rely on statements of third-parties unless they know "that the statements are probably false" or have "some obvious reason to doubt their accuracy."[131] Even where the plaintiff is not a public figure, authors may rely on third party statements so long as they are not "negligent or unreasonable in doing so."[132]

The Ninth Circuit's recent decision in *Price v. Stossel*,[133] decided under California law, provides substantial guidance here. In *Price*, the defendants had broadcast a video clip of the plaintiff delivering a sermon where the plaintiff appeared to be boasting about his material wealth.[134] The clip was part of a report about wealthy preachers and Christian ministries lacking fiscal transparency and accountability.[135] The plaintiff was personally very wealthy, but had been speaking in the clip about "a hypothetical person who, though wealthy, was spiritually unfulfilled."[136] The plaintiff asserted claims for implied defamation, alleging that the defendants' report implied "that he engaged in criminal and/or dishonest conduct" and that "he lacks transparency in his Church dealings."[137] While recognizing that juxtaposing a series of true facts may create a defamatory meaning, the court indicated that the statement "must reasonably 'be understood as implying the alleged defamatory content'" in order to state a claim for implied defamation.[138]

The court then found that the report did not imply that the plaintiff had engaged in criminal or dishonest conduct.[139] It noted that the report "did not discuss any identifiable crime"—in fact, the report had stated that there was a "lack of legal constraints" on ministries.[140] The court further found that the plaintiff's claim that the report implied that he was dishonest was "too vague to constitute actionable defamation."[141] Finally, the court concluded that the plaintiff's claim that the broadcast implied that he lacked transparency was protected by the First Amendment because the factual basis—a refusal to disclose tax filings in response to a call from a watchdog group—was disclosed.[142]

With this framework in mind, the Court will now examine the specific alleged defamatory statements.

---

130. *Flowers v. Carville*, 310 F.3d 1118, 1128 (9th Cir.2002); *see also Dixson v. Newsweek, Inc.*, 562 F.2d 626, 630–31 (10th Cir.1977).

131. *Gardner v. Martino*, 563 F.3d 981, 989 (9th Cir.2009) (citing *Flowers*, 310 F.3d at 1129–30).

132. *Id.* At this early stage, the Parties have not briefed whether the Plaintiffs are "public figures," however, it appears to the Court that—at the very least—the matters here are issues of public interest. *Cf. Olivit v. City & Borough of Juneau*, 171 P.3d 1137, 1143 (Alaska 2007) (finding that under Alaska law, "to make a claim for defamation on speech about a matter of public interest, a plaintiff must show that the false and defamatory statements were made with actual malice.").

133. 620 F.3d 992 (9th Cir.2010).

134. *Id.* at 995.

135. *Id.* at 996–98.

136. *Id.*

137. *Id.* at 1003.

138. *Id.*

139. *Id.* at 1003–04.

140. *Id.*

141. *Id.* at 1004.

142. *Id.* at 1004–05.

### 1. "Special Access"

■ Plaintiffs argue that the statements that Suulutaaq is an ANC, that it "enjoys special access to federal contracts," and that "special access" is "how it obtained" the Napa contract,[143] imply that it "does not deserve the Napa contract, and only received it as an affirmative action set-aside."[144]

There can be no dispute that Suulutaaq is an ANC and that ANCs may participate in the SBA's § 8(a) program, which provides participants with access to government contracts that nonparticipants do not have. There is also no dispute that Suulutaaq obtained the Napa contract through the § 8(a) program. The question is whether these statements are reasonably capable of implying an actionable defamatory meaning. The Court concludes that they are not.

The Article accurately indicates that Suulutaaq obtained the Napa contract through the § 8(a) program. Even if the Article does associate Suulutaaq with "an affirmative action" program, however, that is not defamatory. "Affirmative action" programs are commonplace in modern society, and while not universally popular, they are not "odious, infamous or ridiculous." Regardless, the Article fairly explains the factual basis for the "special access" statement, accurately describing the § 8(a) program as "a preferential contracting program to aid disadvantaged businesses" run by "the U.S. Small Business Administration."[145] Similarly, the question of whether Suulutaaq "deserves" the contract is far too subjective to form the basis of a defamation claim.[146] Accordingly, the "special access" statements are not actionable.

### 2. Government "Connections"

■ Plaintiffs argue that the discussion of tribal corporations hiring consultants—like Boyle—with "connections" to obtain federal contracts and the omission of Suulutaaq's statement that it did not attempt to influence any officials in obtaining the Napa contract imply that Suulutaaq violated "federal lobbying statutes and regulations" and "used illicit means to obtain the Napa contract."[147]

*Price* is directly on point here. Nowhere does the Article accuse Plaintiffs of violating the law. Indeed, the fair implication of the Article is that Plaintiffs used *lawful* means to obtain the Napa contract—e.g., "measures crafted by" the late Senator Stevens, who was a "lawmaker."[148] The Article further notes that critics have proposed their own "measure" to "cap" the program, but so far they have been unsuccessful.[149] Accordingly, the

---

143. The Article describes the Napa contract as a "federal stimulus contract," which Plaintiffs contend is incorrect. Plaintiffs do appear to acknowledge that the contract was partially funded with money from the "Stimulus" program, but note that Suulutaaq was awarded the contract before Congress passed the "Stimulus" legislation. *See* Dkt. 1 ¶¶ 26, 35; *see also* American Reinvestment & Recovery Act of 2009, Pub.L. No. 111–5, 123 Stat. 115 (2009) (dated February 17, 2009). Regardless, it is a matter of detail not the "gist" or "sting" of this particular statement.

144. Dkt. 1 ¶¶ 26–27.

145. Dkt. 4 Ex. C at 2.

146. Indeed, some readers might conclude that socially and economically disadvantaged business concerns like Suulutaaq *do* deserve federal contracts in light of the purposes of the § 8(a) program. *Cf. id.* at 2–3 ("Advocates say the [§ 8(a)] program has provided crucial economic development for impoverished Alaskan tribes. It's a way of redressing centuries of grievous wrongs against them, they say.").

147. Dkt. 1 ¶ 28–30.

148. Dkt. 4 Ex. C at 2.

149. *Id.* at 3.

government "connections" statements are not actionable.[150]

### 3. "Measures Crafted by" Senator Stevens

■ Plaintiffs argue that the statement that ANCs "emerged as players in federal contracting" thanks to " 'measures crafted ... by former U.S. Sen. Ted Stevens, a powerful lawmaker whose career ended with a contracting scandal' implies that Suulutaaq violated federal lobbying laws and illegally obtained the Napa Contract."[151] The Court disagrees.

As noted above, the Article implies that the "measures" are lawful. Nor does the statement reasonably imply that Suulutaaq was somehow involved in Senator Stevens' "contracting scandal" or that the "scandal" somehow cast doubt on the legality of the § 8(a) program.[152] Accordingly, the statements associating ANCs with "measures crafted by" Senator Stevens are not actionable.

### 4. Suulutaaq's Prior Projects

■ Plaintiffs allege that the discussion of Suulutaaq's prior projects (including developing a goldfield, replacing a sewage pump, rebuilding meat lockers) while omitting its "extensive experience relevant to" the Napa project implies that Suulutaaq is not qualified to perform the Napa contract and only obtained it as "an affirmative action set-aside."[153]

As noted above, the purported implication that Suulutaaq only obtained the Napa contract as "an affirmative action set-aside" is not actionable. Apart from that, Plaintiffs do not claim that the description of Suulutaaq's prior projects is inaccurate. Plaintiffs contend that the statements are actionable because they imply that Suulutaaq is not qualified to perform the Napa contract due to their juxtaposition and the omission of Suulutaaq's relevant experience.[154] Even if it does, the suggestion that Suulutaaq is "not qualified" is too subjective to form the basis for a defamation claim. In any event, the Article fully discloses the factual support for these statements and also explicitly indicates that government representatives are "pleased with Suulutaaq's work."[155]

---

**150.** Plaintiffs also argue that the Article falsely indicates that Suulutaaq "rebuffed" questions about whether it employed lobbyists. Dkt. 1 ¶ 28. However, in response to a question about whether it "employed consultants in the lower 48 to assist it in pursuing contracts" specifically including "lobbyists," it responded that it would "not answer questions which seek information relating to Suulutaaq's proprietary and confidential business information." Dkt. 44 Ex. A at 2. The response then went on to state that Suulutaaq could "not find any evidence suggesting" that it "made any attempt to influence" various governmental representatives that the Napa project should be a "set aside" or "reserved for Suulutaaq in any manner." *Id.* Thus, Suulutaaq did rebuff the questions about whether it *generally* employed lobbyists, providing information on a more specific point regarding whether it engaged in "lobbying" in order to obtain the Napa contract. Re-

gardless of whether Defendants' characterization of Suulutaaq's response is fair, this is a matter of detail and not the "gist" of the point here.

**151.** Dkt. 1 ¶¶ 31–32.

**152.** In any event, the details of the charges against Senator Stevens have been well publicized, including the fact that the Senator's conviction was set aside and the charges were dismissed. *See United States v. Stevens*, No. 08–cr–231 (EGS), 2009 WL 6525926, at *1 (D.D.C. Apr. 7, 2009).

**153.** Dkt. 1 ¶¶ 33–34.

**154.** The Complaint does not describe the information that Plaintiffs contend was wrongfully omitted in any further detail.

**155.** Dkt. 4 Ex. C at 1.

#### 5. *Stimulus Funds*

■ Plaintiffs allege that the description of Congressman Thompson helping to obtain "$54 million in stimulus funds" for the Napa project after Suulutaaq won the contract implies that Suulutaaq "obtained . . . stimulus funding by illicit means, in violation of federal lobbying statutes and regulations."[156] The Court disagrees. The "Stimulus" program was legal and, as previously stated, the Article does not imply that Suulutaaq bribed Congressman Thompson or any other public officials or engaged in any manner of criminal wrongdoing whatsoever.

#### 6. *"Suulutaaq Isn't Doing Much"*

■ Plaintiffs argue that Brosamer's quotes indicating that Suulutaaq "isn't doing much" and subcontracted out "much of the job" imply that Suulutaaq is "incompetent to perform the Napa Contract itself" and violated federal law "by hiring an excessive number of subcontractors."[157]

The Court disagrees. The Article does not imply that Suulutaaq engaged in any criminal activity. As previously stated, the Article explains that Suulutaaq obtained the contract through legal means. It explains that the § 8(a) program permits "no bid contracts" and allows participants to "pass[ ] through work to subcontractors."[158] The Article questions that program,[159] but it does not imply that Suulutaaq has violated any laws by participating in it. Indeed, the version of the Article published on California Watch's website further states that "Suulutaaq said the company was complying with federal law regarding hiring subcontractors."[160]

Plaintiffs' suggestion that the statements imply that Suulutaaq is "incompetent"—like the alleged implication that Suulutaaq is "unqualified"—is too subjective to be actionable. Even if it were not, the basis for the suggestion—that Suulutaaq subcontracted out a majority of the work—is disclosed.[161]

#### 7. *The Government "Overpaid" Suulutaaq*

■ Plaintiffs allege that Brosamer's statement that it would have been "cheaper" if the Army Corps had put the contract "out to bid" and that Suulutaaq is "keeping" 38 percent of the contract price without stating that it is "performing over 40% of the work on the Napa Contract" imply that the government "overpaid for the Napa Contract" and that "Suulutaaq is unjustifiably 'keeping' . . . unearned profits after subcontracting out all the work."[162]

As noted above, the Article indicates that the § 8(a) program allows Suulutaaq to subcontract out work while still "collecting a profit."[163] Plaintiffs' contentions that the statements imply that Suulutaaq's actions are "unjustified" or that it has not "earned" the contract price are too subjective to form the basis of an actionable claim.

The Article does, however, imply that the § 8(a) program, in general, and the Napa project, in particular, are wasteful. That is the "gist" or "sting" of the Article. It also appears—at this early stage of the

---

156. Dkt. 1 ¶¶ 35–37.

157. *Id.* ¶¶ 38–40.

158. Dkt. 4 Ex. C at 2–3.

159. *See id.*

160. *Id.* Ex. A at 5. The versions published by the Chronicle omit this statement. *See id.* Exs. B–C.

161. *See id.* Ex. C at 5.

162. Dkt. 1 ¶¶ 41–42.

163. Dkt. 4 Ex. C at 3.

litigation—that Brosamer's claim that the contract would have been "cheaper" if it had been put "out to bid" is potentially susceptible to being proven true or false. The basis for these statements are not disclosed. In order to prevail, Suulutaaq would have to prove that the government would have paid at least the same amount that it paid to Suulutaaq had it put out the contract to bid *and* that Defendants were not justified in relying on Brosamer's statements.[164] At this stage of the litigation, the Court cannot say that is implausible.

### 8. Boyle is a "Lousy Businessman"

█ Plaintiffs argue that the quotes from Sailnet's disgruntled investors stating that they "would not invest" money with Boyle and that he is a "lousy businessman," as well as the statement that Sailnet "burned through 13 million in venture capital ... but ... never made a profit" imply that Boyle is incompetent, dishonest, and "conned people into investing in Sailnet" which he "personally caused ... to fail."[165]

The quotes from the disgruntled investors are inherently subjective matters of opinion which are not actionable. In any event, the basis for their opinions—the fact that Sailnet spent millions in capital without making a profit under Boyle—is disclosed. Boyle did not dispute the assertion.[166] The Article also discloses that Boyle left the company by the time that it went bankrupt.[167] Accordingly, these statements are not actionable.

### 9. Boyle's "Responsibility" For Sailnet's Bankruptcy

█ The Article indicates that Boyle "wrote that the dot-com's bankruptcy was 'a tragedy' for which he was not responsible because he had left the company by the time it occurred."[168] Plaintiffs appear to suggest that this statement is implies that Boyle's only basis for claiming that he "was not responsible" for Sailnet's demise was the fact that he left before it happened. They further allege that the omission of information Boyle provided to Williams explaining that he "simply followed" instructions from Sailnet's board of directors, that Sailnet was not in danger of going bankrupt when he left the company, that many other "dot-com" ventures went bankrupt in the same time frame, and that Boyle is personally "grieved by the failure of Sailnet, as he and his wife also lost everything they put into the venture" implies that "all the blame for Sailnet's bankruptcy" should be placed "at Mr. Boyle's feet."[169]

The Article plainly does imply that Boyle was responsible for Sailnet's bankruptcy. This is the "gist" or "sting" of this part of the discussion. However, the Article also suggests that Boyle and the disgruntled investors disagree about who was responsible for the bankruptcy.[170] Additionally, the Article also discloses the basis for this assertion, which is the that "Sailnet burned through more than $13 million

**164.** *See Gardner v. Martino*, 563 F.3d 981, 989 (9th Cir.2009) (citing *Flowers*, 310 F.3d at 1129–30).

**165.** Dkt. 1 ¶¶ 20–21.

**166.** Dkt. 25 Ex. B at 3 ("I don't have the exact numbers at hand but SailNet surely spent more than $13M between 1999 and 2004.").

**167.** Dkt. 4 Ex. C at 2.

**168.** Dkt. 4 Ex. C at 2. Boyle had stated: "Let me be clear, SailNet's demise was a tragedy." Dkt. 25 Ex. B at 1. He then went on to explain

that his family, along with other small investors, had lost "everything they had put into the company." *Id.*

**169.** Dkt. 1 ¶ 22.

**170.** *See* Dkt. 4 Ex. C at 2. One version of the article also indicates that "Boyle said that hundreds of start-ups failed when the dot-com bubble burst, with many 'burning through millions more in venture capital than Sailnet ultimately did.'" *Id.* Ex. A at 3.

in venture capital" under Boyle.[171] As noted above, Boyle did not dispute this.[172] Accordingly, an ordinary reader is capable of evaluating the implication in light of the Defendants' basis for making it and the statement is not actionable. In any event, the question of who was "responsible" for Sailnet's bankruptcy is too subjective to be proven true or false.

### 10. Boyle's Ability to Obtain Government Contracts

▮ Plaintiffs allege that the statements identifying Boyle as being "a former consultant for government agencies" and as working for TKC Aerospace which "obtained $117 million" in contracts without mentioning any of the details of those contracts implies that Boyle's "sole value to Suulutaaq is an ability to obtain undeserved federal contracts through illicit means, in violation of federal lobbying statutes and regulations." [173]

Plaintiffs do not dispute that Boyle was "a former consultant for government agencies" or that TKC Aerospace successfully obtained lucrative contracts.[174] And, as discussed above, the Article does not imply that Suulutaaq or Boyle violated any laws and the question of whether Suulutaaq "deserved" federal contracts is inherently subjective. Accordingly, the statements are not actionable.

### 11. The Article "Taken As a Whole"

▮ Plaintiffs allege that "taken as a whole," the Article leads ordinary readers to reach the same defamatory conclusions that they tie to specific statements in the Articles.[175] For the same reasons that most of the individual statements identified by Plaintiffs are not actionable, Plaintiffs' argument the Article is defamatory when "taken as a whole" also fails.

Here, the essence of Plaintiffs' claim are that Defendants' Article implies that they violated federal laws or regulations.[176] However, the Article never states or implies that Plaintiffs violated any laws or regulations. To the contrary, the Article indicates that the "measures" that allowed Suulutaaq to obtain the Napa contract were crafted by "a powerful *lawmaker*." [177] The Article also implies that those "measures" allow ANCs like Suulutaaq to "pass through work to subcontractors." [178] The Article notes that other lawmakers oppose the measures and have unsuccessfully sought to "cap" them.[179] It does note that these efforts failed "in the face of intense lobbying by tribal corporations," but there is no suggestion that this lobbying was illegal.[180] While the Article suggests that these measures are controversial, it does not imply that they are, in any way, ille-

---

171. *Id.* Ex. C at 4.

172. Dkt. 25 Ex. B at 3.

173. Dkt. 1 ¶¶ 23 –24.

174. Indeed, Boyle's statement indicated that he "ran a successful consulting business" prior to working for Sailnet and had clients who were "government contractors" and "government agencies." Dkt. 25 Ex. B at 2.

175. *See* Dkt. 1 ¶¶ 14, 16.

176. *See, e.g., id.* ¶ 14.

177. Dkt. 4 Ex. C at 2 (emphasis added).

178. *Id.* at 3.

179. *Id.*

180. Indeed, lobbying is protected by the Constitution. U.S. Const. amend. I ("Congress shall make no law ... abridging the ... the right of the people ... to petition the Government for a redress of grievances."); *see also Page v. City of Rialto,* 865 F.2d 1271, No. 88–5560, 1989 WL 1715, at *2 (9th Cir. Jan. 4, 1989) (indicating that "fundamental first amendment values" protect lobbying activities).

gal.[181] The plain implication is that all of Plaintiffs' actions were *lawful.*

Indeed, that is what the actual "gist" of the Article is—that the government is spending too much money on an arguably unnecessary project because of laws that provide preferential treatment for certain groups. This plays in to the ongoing high profile public debate about government spending, the federal deficit, and programs that seek to remedy historical disadvantages with preferential treatment. The mere fact that the Article associates Plaintiffs with things—such as federal spending, affirmative action, and lobbying—that may be unpopular (in the abstract, anyway), does not imply that they have broken the law.

Otherwise, Plaintiffs focus on subjective implications, contending that the Article implies that they are "incompetent," are "dishonest," are "manipulative," and "do not deserve federal contracts." [182] These alleged implications are inherently subjective and are incapable of being proven true or false and they cannot form the basis of a defamation claim here.

### IV. CONCLUSION

For the foregoing reasons, the bulk of Plaintiffs' claims are legally insufficient. Accordingly, the Court GRANTS, in part, and DENIES in part, Defendants' motions for judgment on the pleadings (Docket Nos. 24 and 26). As the Court has resolved these issues on the Parties' briefing, Defendants' request for a hearing (Docket No. 48) is DENIED. Plaintiffs' claims are dismissed except that Suulutaaq may proceed with its defamation claim based on the theory that the Article falsely implies that the Napa project would have been "cheaper" if it had been "put out to bid" as opposed to being awarded to Suulutaaq, consistent with this Order. Plaintiffs may

serve and file an amended complaint no later than **December 30, 2010,** seeking relief under that theory and any additional theories that are not inconsistent with this Order. Plaintiffs may not replead their claims based on statements or theories addressed barred by this Order.

---

**181.** Dkt. 4 Ex. C at 2–3.

**182.** *See* Dkt. 1 ¶¶ 14, 16.